TINA WOLFSON (SBN 174806)
*twolfson@ahdootwolfson.com*
ROBERT AHDOOT (SBN 172098)
*rahdoot@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Telephone: 310.474.9111
Facsimile:  310.474.8585

ANDREW W. FERICH (*pro hac vice* to be filed)
*aferich@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Telephone: 310.474.9111
Facsimile:  310.474.8585

*Attorneys for Plaintiffs and the Proposed Classes*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GRACE BEYER, CHARLES TYER, CHRISTOPHER HAUSER, and STEFANIE BURTON, individually and on behalf of all others similarly situated, | Case No. 5:21-cv-02239-EJD |
| | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| FLAGSTAR BANCORP, INC., FLAGSTAR BANK, FSB, and ACCELLION, INC., | Complaint filed March 30, 2021 |
| Defendants. | |

---

SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Grace Beyer, Charles Tyer, Christopher Hauser, and Stefanie Burton ("Plaintiffs"), individually and on behalf of all others similarly situated, upon personal knowledge of facts pertaining to themselves and on information and belief as to all other matters, by and through undersigned counsel, bring this Class Action Complaint against Defendants Accellion, Inc. ("Accellion"), Flagstar Bancorp, Inc., and Flagstar Bank, FSB (together, "Flagstar") (altogether, "Defendants").

## NATURE OF THE ACTION

1.    Plaintiffs bring this class action on behalf of themselves and all other individuals ("Class members") who had their sensitive personal information—including but not limited to names, phone numbers, addresses, Social Security numbers (SSN), tax records, and other banking information[1] (collectively, "Personal Information" or "PII")—disclosed to unauthorized third parties during a data breach compromising Accellion's legacy File Transfer Appliance software (the "Data Breach").

2.    Accellion made headlines in late 2020/early 2021 (and continues to receive a raft of negative publicity) following its December 23, 2020 disclosure to numerous clients that criminals breached Accellion's client-submitted data via vulnerabilities in its "secure" file transfer application.[2]

3.    Accellion is a software company that provides third-party file transfer services to clients. Accellion makes and sells a file transfer service product called the File Transfer Appliance ("FTA"). Accellion's FTA is a 20-year-old, obsolete, "legacy product" that was "nearing end-of-life"[3] at the time of the Data Breach, thus leaving it vulnerable to compromise and security incidents.

4.    During the Data Breach, unauthorized persons gained access to Accellion's clients' files by exploiting a vulnerability in Accellion's FTA platform.

---

[1] Lawrence Abrams, *Flagstar Bank hit by data breach exposing customer, employee data*, BLEEPINGCOMPUTER (Mar. 8, 2021, 10:21 A.M.), https://www.bleepingcomputer.com/news/security/flagstar-bank-hit-by-data-breach-exposing-customer-employee-data/ (last visited Aug. 27, 2021).

[2] Lucas Ropek, *The Accellion Data Breach Seems to Be Getting Bigger,* GIZMODO (Feb. 11, 2021, 8:47 P.M.), https://gizmodo.com/the-accellion-data-breach-seems-to-be-getting-bigger-1846250357 (last visited Aug. 27, 2021).

[3] ACCELION, *Accellion Responds to Recent FTA Security Incident* (Feb. 1, 2021), https://www.accellion.com/company/press-releases/accellion-provides-update-to-recent-fta-security-incident/ (last visited Aug. 27, 2021).

5.      On March 5, 2021, Flagstar publicly confirmed that the PII of certain customers was compromised in the well-publicized Data Breach of its file transfer software vendor, Accellion.

6.      In an official release posted to its website, Flagstar identified:

Accellion, a vendor that Flagstar uses for its file sharing platform, informed Flagstar on January 22, 2021, that the platform had a vulnerability that was exploited by an unauthorized party. After Accellion informed us of the incident, Flagstar permanently discontinued use of this file sharing platform. Unfortunately, we have learned that the unauthorized party was able to access some of Flagstar's information on the Accellion platform and that we are one of numerous Accellion clients who were impacted.[4]

7.      Little information is available about the disclosure of Flagstar's customer (or other) information at this time. On Flagstar's dedicated page to the Accellion breach, Flagstar indicates that it is in the process of notifying impacted individuals, and that Flagstar is "aware that those responsible for this incident are in some cases contacting Flagstar customers by e-mail and by telephone."[5]

8.      Flagstar's release is clear that its bank customers (and perhaps others) are already experiencing the fallout of the Data Breach, as criminals are already attempting to contact breach victims in an attempt to defraud victims.

9.      At the time of the Data Breach, Flagstar, along with numerous others, was a client of Accellion. Accellion's services to Flagstar, and the other customers, included the use of Accellion's outdated and vulnerable FTA platform for large file transfers. The Personal Information of Flagstar's customers has been accessed by and disclosed to criminals without authorization, who were able to exploit vulnerabilities in Accellion's FTA product.

10.     Defendants were well aware of the data security shortcomings in Accellion's FTA product. Nevertheless, Defendants continued to use FTA, putting Flagstar's customers at risk of being impacted by a breach.

11.     Defendants' failures to ensure that the file transfer services and products used by Flagstar were adequately secure fell far short of their obligations and Plaintiffs and Class members' reasonable expectations for data privacy, jeopardized the security of Plaintiffs and Class member's Personal

---

[4] FLAGSTAR BANK, *Accellion Incident Information Center*, https://www.flagstar.com/customer-support/accellion-information-center.html (last visited Aug. 27, 2021).

[5] *Id.*

Information, and exposed Plaintiffs and Class members to fraud and identity theft or the serious risk of fraud and identity theft.

12.     As a result of Defendants' conduct and the resulting Data Breach, Plaintiffs' and Class members' privacy has been invaded, their Personal Information is now in the hands of criminals, they have either suffered fraud or identity theft, or face a substantial risk of identity theft and fraud. Accordingly, these individuals now must take immediate and time-consuming action to protect themselves from such identity theft and fraud.

## **PARTIES**

13.     Plaintiff Grace Beyer is an adult citizen of the state of California and resides in Chula Vista, California. Believing Flagstar would implement and maintain reasonable security and practices to protect customer Personal Information, Plaintiff provided Personal Information to Flagstar. Plaintiff routinely banks with Flagstar. On or about March 15, 2021, Flagstar sent Plaintiff Beyer, and Plaintiff Beyer received, a letter confirming that her Personal Information was impacted by the Data Breach. In the letter, Flagstar identified that the nature of the information involved includes her "Social Security Number, First Name, Last Name, Account Number, Address." As a result of learning that she was impacted by the Data Breach, Plaintiff Beyer has spent at least 24 hours looking through and monitoring her accounts for fraud, setting up credit monitoring, and taking other measures in the fallout of the Data Breach to prevent fraud and identity theft.

14.     Plaintiff Charles Tyer is an adult citizen of the state of Texas and resides in Friendswood, Texas. Believing Flagstar would implement and maintain reasonable security and practices to protect customer Personal Information, Mr. Tyer provided Personal Information to Flagstar. Mr. Tyer routinely banks with Flagstar. On or about March 15, 2021, Flagstar sent Mr. Tyer, and Mr. Tyer received, a letter confirming that his Personal Information was impacted by the Data Breach. In the letter, Flagstar identified that the nature of the information involved includes his "Social Security Number, First Name, Last Name, Account Number, Address." As a result of learning that he was impacted by the Data Breach, Mr. Tyer has spent at least 11 hours looking through and monitoring his accounts for fraud, setting up credit monitoring, and taking other measures in the fallout of the Data Breach to prevent fraud and identity theft.

SECOND AMENDED CLASS ACTION COMPLAINT

15.     Plaintiff Christopher Hauser is an adult citizen of the state of Utah and resides in Roy, Utah. Believing Flagstar would implement and maintain reasonable security and practices to protect customer Personal Information, Mr. Hauser provided Personal Information to Flagstar. Mr. Hauser provided his Personal Information in connection with home mortgage services obtained from Flagstar. On or about March 15, 2021, Flagstar sent Mr. Hauser, and Mr. Hauser received, a letter confirming that his Personal Information was impacted by the Data Breach. In the letter, Flagstar identified that the nature of the information involved includes his "Social Security Number, First Name, Last Name, Phone Number, Address." As a result of learning that he was impacted by the Data Breach, Mr. Hauser has spent at least 8 hours looking through and monitoring his accounts for fraud, setting up credit monitoring, and taking other measures in the fallout of the Data Breach to prevent fraud and identity theft. Mr. Hauser attempted to obtain identity monitoring services from Kroll, the company hired by Flagstar to provide such services. However, Mr. Hauser could not get any assistance from Kroll or any of Kroll's representatives. Mr. Hauser instead spent $239.99 to obtain identity theft and credit monitoring services from another company.

16.     Plaintiff Stefanie Burton is an adult citizen of the state of Michigan and resides in Dearborn, Michigan. Believing Flagstar would implement and maintain reasonable security and practices to protect customer Personal Information, Plaintiff provided Personal Information to Flagstar. Plaintiff Burton provided her Personal Information in connection with home mortgage services obtained from Flagstar.  On or about March 15, 2021, Flagstar sent Plaintiff Burton, and Plaintiff Burton received, a letter confirming that her Personal Information was impacted by the Data Breach. In the letter, Flagstar identified that the nature of the information involved includes her "Social Security Number, First Name, Last Name, Account Number, Phone Number, Address." As a result of learning that she was impacted by the Data Breach, Plaintiff Burton has spent over 40 hours looking through and monitoring her accounts for fraud, setting up credit monitoring, pulling credit reports and reviewing them, reviewing and responding to credit monitoring alerts, and taking other measures in the fallout of the Data Breach to prevent fraud and identity theft.

17.     Defendant Accellion, Inc. is a Delaware corporation with corporate headquarters located at 1804 Embarcadero Road, Suite 200, Palo Alto, California 94303.

18.     Defendant Flagstar Bancorp, Inc. (NYSE: FBC) is a Michigan corporation with its corporate headquarters located at 5151 Corporate Drive, Troy, Michigan 48098.

19.     Defendant Flagstar Bank, FSB is a Michigan-based federally chartered stock savings bank with its corporate headquarters located at 5151 Corporate Drive, Troy, Michigan 48098.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(a) and (d), because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of five million dollars ($5,000,000.00) and is a class action in which one or more Class members are citizens of states different from Defendants.

21.     The Court has personal jurisdiction over Defendants because Accellion has a principal office in California, Flagstar operates bank branches in California, Defendants conduct other significant business in California, and Defendants otherwise have sufficient minimum contacts with and intentionally avail themselves of the markets in California.

22.     Venue properly lies in this judicial district because, *inter alia,* Accellion has a principal place of business in this district; Defendants transact substantial business, have agents, and are otherwise located in this district; and a substantial part of the conduct giving rise to Plaintiffs' claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

A.     **Accellion and its Unsecure File Transfer Platform, FTA**

23.     Accellion is a Palo Alto-based software company that makes, markets, and sells file transfer platforms and services.

24.     Accellion touts its products and services as "prevent[ing] data breaches"[6] and as being secure. On its website, Accellion states:

> The Accellion enterprise content firewall *prevents data breaches and compliance violations from third party cyber risk*. CIOs and CISOs *rely on the Accellion platform for complete*

---

[6] ACCELLION, *About Accellion,* https://www.accellion.com/company/ (last visited Aug. 27, 2021).

*visibility, security and control* over . . . *sensitive content* across email, file sharing, mobile, enterprise apps, web portals, SFTP, and automated inter-business workflows.[7]

25.     Accellion also touts its commitment to data privacy, claiming that "[d]ata privacy is a fundamental aspect of the business of Accellion . . . ."[8]

26.     Accellion markets its products and services as capable of safely transferring sensitive Personal Information through file sharing, claiming that "[w]hen employees click the Accellion button, they know it's the *safe*, *secure* way to share sensitive information. . . ."[9]

27.     Despite these assurances and claims, Accellion failed to offer safe and secure file transfer products and services and failed to adequately protect Plaintiffs' and Class members' Personal Information entrusted to it by Accellion's clients, including Flagstar.

28.     Accellion's FTA product, which Flagstar and many of Accellion's other clients used, was not secure and, by Accellion's own acknowledgment, outdated.

29.     The FTA—or File Transfer Appliance—is Accellion's twenty-year-old "legacy" file transfer software, which purportedly is designed and sold for large file transfers.[10]

30.     Accellion's FTA is an obsolete "legacy product" that was "nearing end-of-life,"[11] thus leaving it vulnerable to compromise and security incidents. Accellion acknowledged that the FTA program is insufficient to keep file transfer processes secure "in today's breach-filled, over-regulated

---

[7] *Id.* (emphasis added).

[8] ACCELLION, *Accellion Privacy Policy*, https://www.accellion.com/privacy-policy/ (last visited Aug. 27, 2021).

[9] ACCELLION, *About Accellion*, https://www.accellion.com/company/ (last visited Aug. 27, 2021) (emphasis added).

[10] ACCELLION, *Accellion Responds to Recent FTA Security Incident* (Jan. 12, 2021), https://www.accellion.com/company/press-releases/accellion-responds-to-recent-fta-security-incident/ (last visited Aug. 27, 2021).

[11] ACCELLION, *Press Release, Accellion Provides Update to Recent FTA Security Incident* (Feb. 1, 2021), https://www.accellion.com/company/press-releases/accellion-provides-update-to-recent-fta-security-incident/ (last visited Aug. 27, 2021).

world" where "you need even broad protection and control."[12] On the page dedicated to Accellion FTA, Accellion's website states: "End-of-Life Announced for FTA. No Renewals After April 30, 2021."[13]

31.    Key people within Accellion have acknowledged the need to leave the FTA platform behind due to the security concerns raised by it. Accellion's Chief Marketing Officer Joel York confirmed that Accellion is encouraging its clients to discontinue use of FTA because it does not protect against modern data breaches: "It just wasn't designed for these types of threats . . . ."[14]

32.    Accellion's Chief Information Security Officer Frank Balonis stated: "Future exploits of [FTA] . . . are a constant threat. We have encouraged all FTA customers to migrate to kiteworks for the last three years and have accelerated our FTA end-of-life plans in light of these attacks. We remain committed to assisting our FTA customers, but strongly urge them to migrate to kiteworks as soon as possible."[15]

33.    Despite knowing that FTA left Accellion's customers (like Flagstar) and third parties interacting and transacting with its customers (like Plaintiffs and Class members) exposed to security threats, Accellion continued to offer, and Flagstar continued to utilize, the FTA file transfer product at the time of the Data Breach.

### C.    <u>The Data Breach</u>

34.    On December 23, 2020, the inevitable happened: Accellion confirmed to numerous clients that it experienced a massive security breach whereby criminals were able to gain access to sensitive client data via a vulnerability in its FTA platform.[16]

---

[12] ACCELLION, *Accellion FTA*, https://www.accellion.com/products/fta/ (last visited Aug. 27, 2021).

[13] *Id.*

[14] Jim Brunner & Paul Roberts, *Banking, Social Security info of more than 1.4 million people exposed in hack involving Washington State Auditor*, SEATTLE TIMES (Feb. 3, 2021, 4:57 P.M.), https://www.seattletimes.com/seattle-news/politics/personal-data-of-1-6-million-washington-unemployment-claimants-exposed-in-hack-of-state-auditor/ (last visited Aug. 27, 2021).

[15] ACCELLION, *Press Release, Accellion Provides Update to Recent FTA Security Incident* (Feb. 1, 2021), https://www.accellion.com/company/press-releases/accellion-provides-update-to-recent-fta-security-incident/ (last visited Aug. 27, 2021).

[16] Lucas Ropek, *The Accellion Data Breach Seems to Be Getting Bigger,* GIZMODO (Feb. 11, 2021, 8:47 P.M.), https://gizmodo.com/the-accellion-data-breach-seems-to-be-getting-bigger-1846250357 (last visited Aug. 27, 2021).

35.    According to reports, the criminals exploited as many as four vulnerabilities in Accellion's FTA to steal sensitive data files associated with up to 300 of Accellion's clients, including corporations, law firms, banks, universities, and other entities.

36.    With respect to how Accellion's FTA was compromised, one report indicates:

> The adversary exploited [the FTA's] vulnerabilities to install a hitherto unseen Web shell named DEWMODE on the Accellion FTA app and used it to exfiltrate data from victim networks. Mandiant's telemetry shows that DEWMODE is designed to extract a list of available files and associated metadata from a MySQL database on Accellion's FTA and then download files from that list via the Web shell. Once the downloads complete, the attackers then execute a clean-up routine to erase traces of their activity.[17]

37.    The criminals, reportedly associated with the well-known Clop ransomware gang, the FIN11 threat group, and potentially other threat actors, launched the attacks in mid-December 2020. The attacks continued from at least mid-December 2020 and into January 2021, as these actors continued to exploit vulnerabilities in the FTA platform. Following the attacks, the criminals resorted to extortion, threatening Accellion's clients, e.g., by email, with making the stolen information publicly available unless ransoms were paid.[18] In at least a few instances, the criminals carried these treats and published private and confidential information online. *See id.*

38.    An example of a message sent by the criminals to a client of Accellion that was victimized during the breach is below[19]:

---

[17] Jai Vljayan, DARKReading, *Accellion Data Breach Resulted in Extortion Attempts Against Multiple Victims* (Feb. 22, 2021, 4:50 P.M.), https://www.darkreading.com/attacks-breaches/accellion-data-breach-resulted-in-extortion-attempts-against-multiple-victims/d/d-id/1340226 (last visited Aug. 27, 2021).

[18] Ionut Ilascu, *Global Accellion data breaches linked to Clop ransomware gang,* BLEEPINGCOMPUTER (Feb. 22, 2021, 9:06 A.M.), https://www.bleepingcomputer.com/news/security/global-accellion-data-breaches-linked-to-clop-ransomware-gang/ (last visited Aug. 27, 2021).

[19] *Id.*

> Hello!
>
> Your network has been hacked, a lot of valuable data stolen. <description of stolen data, including the total size of the compressed files> We are the CLOP ransomware team, you can google news and articles about us. We have a website where we publish news and stolen files from companies that have refused to cooperate. Here is his address http://[redacted].onion/ - use TOR browser or http://[redacted].onion.dog/ - mirror. We are visited by 20-30 thousand journalists, IT experts, hackers and competitors every day. We suggest that you contact us via chat within 24 hours to discuss the current situation. <victim-specific negotiation URL> - use TOR browser We don't want to hurt, our goal is money. We are also ready to provide any evidence of the presence of files with us.

39.     Accellion has remained in the headlines through early 2021 (and continues to receive a raft of negative publicity) following its mid-December 2020 disclosure of the massive Data Breach. The list of groups and clients who used Accellion's unsecure FTA product and were impacted by the Data Breach continues to increase.

40.     The list, to date, reportedly includes (but is not limited to):

- Allens
- American Bureau of Shipping ("ABS")
- Arizona Complete Health
- The Australia Securities and Investments Commission
- Bombardier
- CSX
- Danaher
- Flagstar Bank
- Fugro
- Goodwin Proctor
- Harvard Business School
- Jones Day
- The Kroger Co.
- Morgan Stanley
- The Office of the Washington State Auditor
- QIMR Berghofer Medical Research Institute

SECOND AMENDED CLASS ACTION COMPLAINT

- Qualys
- The Reserve Bank of New Zealand
- Shell Oil Company
- Singtel
- Southern Illinois University School of Medicine
- Steris
- Transport for New South Wales
- Trillium Community Health Plan
- The University of Colorado
- The University of Miami

**C.**   **Flagstar Announces It Was Impacted by the Accellion Data Breach**

41.   Flagstar Bank is a United States Midwest-based bank headquartered in Troy, Michigan. Flagstar has numerous branch and home loan center locations across the United States, and is one of the largest residential mortgage servicers in the country.

42.   Per its website, Flagstar operates 150 branches in Michigan, Indiana, California, Wisconsin, and Ohio, and its mortgage divisions operates nationally through 103 retail locations. With assets of $31 billion, Flagstar touts that it is the sixth largest bank mortgage originator nationally, and the second largest savings bank in the country.[20]

43.   On March 5, 2021, Flagstar publicly confirmed that the Personal Information of Flagstar customers was compromised in the Data Breach, by releasing a statement on its website.

44.   On its webpage dedicated to the Accellion breach, Flagstar provides scant details regarding the Data Breach, including following information, in pertinent part[21]:

**Flagstar Bank Statement on Accellion Vulnerability**

---

[20] FLAGSTAR BANK, *About Flagstar*, https://www.flagstar.com/about-flagstar.html (last visited Aug. 27, 2021).

[21] FLAGSTAR BANK, *Accellion Incident Information Center,* https://www.flagstar.com/customer-support/accellion-information-center.html (last visited Apr. 21, 2021).

Accellion, a vendor that Flagstar uses for its file sharing platform, informed Flagstar on January 22, 2021, that the platform had a vulnerability that was exploited by an unauthorized party. After Accellion informed us of the incident, Flagstar permanently discontinued use of this file sharing platform. Unfortunately, we have learned that the unauthorized party was able to access some of Flagstar's information on the Accellion platform and that we are one of numerous Accellion clients who were impacted.

45.     Flagstar also cautions its customers[22]:

**Information Security Best Practices**

We are aware that those responsible for this incident are in some cases contacting Flagstar customers by e-mail and by telephone. These are communications from unauthorized individuals responsible for the Accellion incident, and you should not respond to them. If you receive a suspicious message, please do not open attachments or click on links.

46.     Flagstar's submissions to California's Attorney General[23] provide little additional information regarding the breach, and is very similar to its dedicated webpage for the Data Breach. The incident reportedly did not affect Flagstar's IT infrastructure outside of the Accellion platform, and Flagstar claims that it permanently discontinued the use of Accellion's FTA.[24]

47.     Flagstar's public statements and notification letter state that it is working to notify and impacted customers, and that Flagstar has secured the services of Kroll to provide identity monitoring for impacted persons for two years.[25]

48.     According to reports, screenshots of stolen Flagstar records and information suggest that impacted data includes sensitive customer and employee information, including SSN, names, addresses, phone numbers, and tax records.[26]

---

[22] *Id*.

[23] California Attorney General, *Submitted Breach Notification Sample*, https://oag.ca.gov/system/files/Flagstar%20Bank%20Ad%20Standard%20r3prf.pdf (last visited Aug. 27, 2021).

[24] *Id*.

[25] *Id*.

[26] Dora Tudor, *US Bank and Mortgage Lender Flagstar Victim of a major data breach,* HEIMDAL SECURITY (Mar. 9, 2021), https://heimdalsecurity.com/blog/flagstar-bank-major-data-breach/ (last visited Aug. 27, 2021).

### D. **Impact of the Data Breach**

49.     The actual extent and scope of the impact of the Data Breach on Flagstar's customers remains uncertain.

50.     Flagstar has confirmed that it has stopped using Accellion's jeopardized FTA services, but unfortunately for Plaintiffs and Class members, the damage is already done.

51.     Flagstar has known that the FTA software is unsecured and should no longer be used in connection with data transfers. Indeed, "[m]ultiple cybersecurity experts . . . highlight that Accellion FTA is a 20-year-old application designed to allow an enterprise to securely transfer large files but it is nearing the end of life," and that "Accellion asked its customers late last year to switch over to a new product it offers called kiteworks."[27] On information and belief, Flagstar failed to timely make the switch to Kiteworks and knowingly continued to use FTA, exposing its customers' (and potentially employees') Personal Information to the risk of theft, identity theft, and fraud.

52.     The harm caused to Plaintiffs and Class members by the Data Breach is already apparent. As identified herein, criminal hacker groups already are threatening Accellion's clients with demands for ransom payments to prevent sensitive Personal Information from being disseminated publicly.

53.     Even if companies, like Flagstar, that were impacted by the Accellion Data Breach pay these ransoms, there is no guarantee that the criminals making the ransom demands will suddenly act honorably and destroy the sensitive Personal Information. In fact, there is no motivation for them to do so, given the burgeoning market for sensitive Personal Information on the dark web.

54.     The Data Breach was particularly damaging given the nature of Accellion's FTA. In the words of one industry expert: "[The] vulnerabilities [in Accellion's FTA] are particularly damaging, because in a normal case an attacker has to hunt to find your sensitive files, and it's a bit of a guessing

---

[27] Jonathan Greig, *Kroger data breach highlights urgent need to replace legacy, end-of-life tools*, TECHREPUBLIC (Feb. 24, 2021, 6:17 A.M.), https://www.techrepublic.com/article/kroger-data-breach-highlights-urgent-need-to-replace-legacy-end-of-life-tools/ (last visited Aug. 27, 2021).

game, but in this case the work is already done . . . By definition everything sent through Accellion was pre-identified as sensitive by a user."[28]

55.     The Data Breach creates a heightened security concern for Plaintiffs and Class members because SSNs and other banking and tax information was potentially disclosed. Theft of SSNs creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of her SSN, and a new SSN will not be provided until after the harm has already been suffered by the victim.

56.     Given the highly sensitive nature of SSNs, theft of SSNs in combination with other personally identifying information (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. Per the United States Attorney General, Social Security numbers "can be an identity thief's most valuable piece of consumer information."[29]

57.     Defendants had a duty to keep Plaintiffs' and Class members' Personal Information confidential and to protect it from unauthorized disclosures. Plaintiffs and Class members provided their Personal Information to Flagstar with the understanding that Flagstar and any business partners to whom Flagstar disclosed the Personal Information (i.e., Accellion) would comply with their obligations to keep such information confidential and secure from unauthorized disclosures.

58.     Defendants' data security obligations were particularly important given the substantial increase in data breaches in recent years, which are widely known to the public and to anyone in Accellion's industry of data collection and transfer.

59.     Data breaches are by no means new and they should not be unexpected. These types of attacks should be anticipated by companies that store sensitive and personally identifying information, and these companies must ensure that data privacy and security is adequate to protect against and prevent known attacks.

---

[28] Lily Hay Newman, *The Accellion Breach Keeps Getting Worse—and More Expensive*, WIRED.COM (Mar. 8, 2021, 7:00 A.M.), https://www.wired.com/story/accellion-breach-victims-extortion/ (quoting Jake Williams, founder of the security firm Rendition Infosec) (last visited Apr. 21, 2021).

[29] *Fact Sheet: The Work of the President's Identity Theft Task Force*, DEP'T OF JUSTICE, (Sept. 19, 2006), https://www.justice.gov/archive/opa/pr/2006/September/06_ag_636.html (last visited Aug. 27, 2021).

60.     It is well known amongst companies that store sensitive personally identifying information that sensitive information—like the SSNs—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[30]

61.     Identity theft victims are frequently required to spend many hours and large amounts of money repairing the impact to their credit. Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, tax fraud, phone or utilities fraud, and bank/finance fraud.

62.     There may be a time lag between when sensitive personal information is stolen and when it is used. According to the GAO Report:

> [L]aw enforcement officials told us that in some cases, *stolen data may be held for up to a year or more before being used to commit identity theft*. Further, once stolen data have been sold or posted on the Web, *fraudulent use of that information may continue for years*. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[31]

63.     With access to an individual's Personal Information, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: obtaining a driver's license or official identification card in the victim's name but with the thief's picture; using the victim's name and SSN to obtain government benefits; or, filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[32]

---

[30] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUSINESS INSIDER (Nov. 19, 2019, 11:05 A.M.), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1 (last visited Aug. 27, 2021).

[31] *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GOVINFO.GOV, June 4, 2007, https://www.govinfo.gov/content/pkg/GAOREPORTS-GAO-07-737/html/GAOREPORTS-GAO-07-737.htm (last visited Aug. 27, 2021) (emphasis added).

[32] *See* FEDERAL TRADE COMMISSION, WARNING SIGNS OF IDENTITY THEFT, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last visited Aug. 27, 2021)

64.     Personal Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the dark web and the "cyber black-market" for years. As a result of recent large-scale data breaches, identity thieves and cyber criminals have openly posted stolen SSNs and other Personal Information directly on various illegal websites making the information publicly available, often for a price.

65.     A study by Experian found that the "average total cost" of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[33] Indeed, data breaches and identity theft have a crippling effect on individuals and detrimentally impact the entire economy as a whole.

66.     Despite the known risk of data breaches and the widespread publicity and industry alerts regarding other notable (similar) data breaches, Defendants failed to take reasonable steps to adequately protect Accellion's FTA from being breached and to properly phase out the unsecure FTA platform, leaving Accellion's clients and its clients' customers and employees exposed to risk of fraud and identity theft.

67.     Accellion is, and at all relevant times has been, aware that the sensitive Personal Information it handles and stores in connection with providing its file transfer services is highly sensitive. As a company that provides file transfer services involving highly sensitive and identifying information, Accellion is aware of the importance of safeguarding that information and protecting its systems and products from security vulnerabilities.

68.     Defendants were aware, or should have been aware, of regulatory and industry guidance regarding data security, and they were alerted to the risk associated with failing to ensure that Accellion's FTA was adequately secured, or phasing out the platform altogether.

---

[33] *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010, 5:00 A.M.), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims (last visited Aug. 27, 2021).

69.     Despite the well-known risks of hackers and cybersecurity intrusions, Defendants failed to employ adequate data security measures in connection with Flagstar's use of Accellion's FTA platform in a meaningful way in order to prevent breaches, including the Data Breach.

70.     The security flaws inherent to Accellion's FTA file transfer platform—and continuing to market and sell a platform with known, unpatched security issues—run afoul of industry best practices and standards. Had Accellion adequately protected and secured FTA, or stopped supporting the product when it learned years ago about its vulnerabilities, it could have prevented the Data Breach.

71.     Despite the fact that Accellion was on notice of the very real possibility of data theft associated with the FTA platform, it still failed to make necessary changes to the product or to stop offering and supporting it, and permitted a massive intrusion to occur that resulted in the FTA platform's disclosure of Plaintiffs' and Class members' Personal Information to criminals.

72.     Defendants permitted Class members' Personal Information to be compromised and disclosed to criminals by failing to take reasonable steps against an obvious threat.

73.     Industry experts are clear that a data breach is indicative of data security failures. Indeed, industry-leading research and advisory firm Aite Group has identified that: "If your data was stolen through a data breach that means you were somewhere out of compliance" with payment industry data security standards.[34]

74.     As a result of the events detailed herein, Plaintiffs and Class members suffered harm and loss of privacy, and will continue to suffer future harm, resulting from the Data Breach, including but not limited to: invasion of privacy; loss of privacy; loss of control over personal information and identities; fraud and identity theft; unreimbursed losses relating to fraud and identity theft; loss of value and loss of possession and privacy of Personal Information; harm resulting from damaged credit scores and information; loss of time and money preparing for and resolving fraud and identity theft; loss of time and money obtaining protections against future identity theft; and other harm resulting from the unauthorized use or threat of unauthorized exposure of Personal Information.

---

[34] Lisa Baertlein, *Flagstar Says Hackers Hit Most Restaurants in Data Breach*, REUTERS (May 26, 2017), http://www.reuters.com/article/us-Flagstar-cyber-idUSKBN18M2BY (last visited Aug. 27, 2021).

SECOND AMENDED CLASS ACTION COMPLAINT

75.     Victims of the Data Breach have likely already experienced harms, which is made clear by news of attempts to exploit this information for money by the hackers responsible for the breach.

76.     As a result of Accellion's failure to ensure that its FTA product was protected and secured, or to phase out the platform upon learning of FTA's vulnerabilities, the Data Breach occurred. As a result of the Data Breach, Plaintiffs' and Class members' privacy has been invaded, their Personal Information is now in the hands of criminals, they face a substantially increased risk of identity theft and fraud, and they must take immediate and time-consuming action to protect themselves from such identity theft and fraud.

## CLASS ALLEGATIONS

77.     Plaintiffs bring this action on behalf of themselves and the following Classes pursuant to Federal Rule of Civil Procedure 23(a) and (b):

**Nationwide Class**

All residents of the United States who were notified by Flagstar that their PII was compromised as a result of the FTA Data Breach. Excluded from the Class are: (1) the Judges presiding over the Action and members of their families; (2) Flagstar and Accellion, their subsidiaries, parent companies, successors, predecessors, and any entity in which Flagstar or Accellion, or their parents, have a controlling interest, and their current or former officers and directors; (3) Persons who properly execute and submit a Request for Exclusion prior to the expiration of the Opt-Out Period; and (4) the successors or assigns of any such excluded Persons.

78.     **Numerosity**: While the precise number of Class members has not yet been determined, members of the Classes are so numerous that their individual joinder is impracticable, as the proposed Classes appear to include many thousands of members who are geographically dispersed.

79.     **Typicality**: Plaintiffs' claims are typical of Class members' claims. Plaintiffs and all Class members were injured through Defendants' uniform misconduct, and Plaintiffs' claims are identical to the claims of the Class members they seek to represent. Accordingly, Plaintiffs' claims are typical of Class members' claims.

80.     **Adequacy**: Plaintiffs' interests are aligned with the Classes they seek to represent, and Plaintiffs have retained counsel with significant experience prosecuting complex class action cases, including cases involving alleged privacy and data security violations. Plaintiffs and undersigned

counsel intend to prosecute this action vigorously. The Classes' interests are well-represented by Plaintiffs and undersigned counsel.

81.     **Superiority**: A class action is the superior—and only realistic—mechanism to fairly and efficiently adjudicate Plaintiffs' and other Class member's claims. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for Class members individually to effectively redress Defendants' wrongdoing. Even if Class members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

82.     **Commonality and Predominance:** The following questions common to all Class members predominate over any potential questions affecting individual Class members:

- whether Defendants engaged in the wrongful conduct alleged herein;
- whether Defendants' data security practices and the vulnerabilities of Accellion's FTA product resulted in the disclosure of Plaintiffs' and other Class members' Personal Information and the FTA Data Breach;
- whether Defendants violated privacy rights and invaded Plaintiffs' and Class members' privacy; and
- whether Plaintiffs and Class members are entitled to damages, equitable relief, or other relief and, if so, in what amount.

83.     Given that Defendants engaged in a common course of conduct as to Plaintiffs and the Classes, similar or identical injuries and common law and statutory violations are involved, and common questions outweigh any potential individual questions.

SECOND AMENDED CLASS ACTION COMPLAINT

## CAUSES OF ACTION

### COUNT I
### Negligence

84.     Plaintiffs reallege and incorporate all previous allegations as though fully set forth herein.

85.     Accellion negligently sold its FTA product which it has acknowledged is vulnerable to security breaches, despite representing that the product could be used securely for large file transfers.

86.     Defendants were entrusted with, stored, and otherwise had access to the Personal Information of Plaintiffs and Class members.

87.     Defendants knew, or should have known, of the risks inherent to storing the Personal Information of Plaintiffs and Class members, and to not ensuring that the FTA product was secure. These risks were reasonably foreseeable to Defendants, because Accellion had previously recognized and acknowledged the data security concerns with its FTA product.

88.     Defendants owed duties of care to Plaintiffs and Class members whose Personal Information had been entrusted to Defendants.

89.     Defendants breached their duties to Plaintiffs and Class members by failing to provide fair, reasonable, or adequate data security in connection Accellion's FTA product. Defendants had a duty to safeguard Plaintiffs' and Class members' Personal Information and to ensure that their systems and products adequately protected Personal Information. Defendants breached this duty.

90.     Flagstar's duty of care arises from its knowledge that its customers entrust it with highly sensitive Personal Information that Flagstar is intended to, and represents that it will, handle securely. Indeed, on its website, Flagstar represents that it "is committed to maintaining the security of the data you provide us."

91.     Accellion's duty of care arises from its knowledge that its customers, like Flagstar, entrust to it highly sensitive Personal Information that Accellion is intended to, and represents that it will, handle securely. Only Accellion was in a position to ensure that its systems and products were sufficient to protect against breaches that exploit its FTA product and the harms that Plaintiffs and Class members have now suffered.

92.     A "special relationship" exists between Defendants, on the one hand, and Plaintiffs and

Class members, on the other hand. Defendants entered into a "special relationship" with Plaintiffs and Class members by agreeing to accept, store, and have access to sensitive Personal Information provided by Plaintiffs and Class members.

93.     But for Defendants' wrongful and negligent breach of their duties owed to Plaintiffs and Class members, Plaintiffs and Class members would not have been injured.

94.     Defendants acted with wanton disregard for the security of Plaintiffs' and Class members' Personal Information, especially in light of the fact that for years Accellion warned of the data security concerns relating to the FTA.

95.     The injury and harm suffered by Plaintiffs and Class members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known they were failing to meet their duties, and that Defendants' breach would cause Plaintiffs and Class members to experience the foreseeable harms associated with the exposure of their Personal Information.

96.     As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class members now face an increased risk of future harm.

97.     As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class members have suffered injury and are entitled to damages in an amount to be proven at trial.

## COUNT II
### Negligence Per Se

98.     Plaintiffs reallege and incorporate all previous allegations as though fully set forth herein.

99.     Pursuant to the Federal Trade Commission Act (15 U.S.C. § 45), Flagstar had a duty to provide adequate data security practices in connection with safeguarding Plaintiffs' and Class members' Personal Information.

100.    Pursuant to the Federal Trade Commission Act (15 U.S.C. § 45), Accellion had a duty to provide adequate data security practices, including in connection with its sale of its FTA platform, to safeguard Plaintiffs' and Class members' Personal Information.

101.    Defendants breached their duties to Plaintiffs and Class members under the Federal Trade Commission Act (15 U.S.C. § 45), the Gramm-Leach-Bliley Act (15 U.S.C. §§ 6801, *et seq.*), Cal. Civ. Code §§ 1798.100, *et seq.*, Cal. Civ. Code §§ 1798.80, *et seq.*, among other statutes, by failing to provide

fair, reasonable, or adequate data security in connection with the sale and use of the FTA platform in order to safeguard Plaintiffs' and Class members' Personal Information.

102.    Defendants' failure to comply with applicable laws and regulations constitutes negligence per se.

103.    But for Defendants' wrongful and negligent breach of their duties owed to Plaintiffs and Class members, Plaintiffs and Class members would not have been injured.

104.    The injury and harm suffered by Plaintiffs and Class members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to meet their duties, and that Defendants' breach would cause Plaintiffs and Class members to experience the foreseeable harms associated with the exposure of their Personal Information.

105.    As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class members have been harmed or now face an increased risk of future harm. As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class members have suffered injury and are entitled to damages in an amount to be proven at trial.

## COUNT III
### Breach of Implied Contract
### (Against Flagstar Defendants Only)

106.    Plaintiffs reallege and incorporate all previous allegations as though fully set forth herein.

107.    Flagstar provides banking services to Plaintiffs and Class members.

108.    In connection with banking with Flagstar, Plaintiffs and Class members entered into implied contracts with Flagstar.

109.    Pursuant to these implied contracts, Plaintiffs and Class members provided Flagstar with their Personal Information. In exchange, Flagstar agreed, among other things: (1) to take reasonable measures to protect the security and confidentiality of Plaintiffs' and Class members' Personal Information; and (2) to protect Plaintiffs' and Class members' Personal Information in compliance with federal and state laws and regulations and industry standards.

110.    The protection of Personal Information was a material term of the implied contracts between Plaintiffs and Class members, on the one hand, and Flagstar, on the other hand. Had

Plaintiffs and Class members known that Flagstar would not adequately protect its customers' Personal Information they would not have done business with Flagstar.

111.    Plaintiffs and Class members performed their obligations under the implied contract when they provided Flagstar with their Personal Information and used Flagstar's banking services.

112.    Necessarily implicit in the agreements between Plaintiffs/Class members and Flagstar was Flagstar's obligation to take reasonable steps to secure and safeguard Plaintiffs' and Class members' Personal Information.

113.    Flagstar breached its obligations under its implied contracts with Plaintiffs and Class members by failing to implement and maintain reasonable security measures to protect their Personal Information.

114.    Flagstar's breach of its obligations of its implied contracts with Plaintiffs and Class members directly resulted in the Data Breach.

115.    The damages sustained by Plaintiffs and Class members as described above were the direct and proximate result of Flagstar's material breaches of its agreements.

116.    Plaintiffs and other Class members were damaged by Flagstar's breach of implied contracts because: (i) they have suffered actual harm or identity theft; (ii) they face a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their Personal Information was improperly disclosed to unauthorized individuals; (iv)  the confidentiality of their Personal Information has been breached; (v) they were deprived of the value of their PII, for which there is a well-established national and international market; and/or (vi) lost time and money incurred to mitigate and remediate the effects of the breach, including the increased risks of identity theft they face and will continue to face.

**COUNT IV**
**Violations of California's Consumer Privacy Act**
**Cal. Civ. Code § 1798.100, *et seq.* ("CCPA")**

117.    Plaintiffs reallege and incorporate all previous allegations as though fully set forth herein.

118.    The CCPA was enacted to protect consumers' Personal Information from collection and use by businesses without appropriate notice and consent.

119.    Through the conduct complained of herein, Defendants violated the CCPA by subjecting the PII of Plaintiff Beyer and Class Members from California to unauthorized access and exfiltration, theft, or disclosure as a result of Defendants' violation of their duties to implement and maintain reasonable security procedures and practices appropriate to the nature and protection of that information. Cal. Civ. Code § 1798.150(a).

120.    In accordance with Cal. Civ. Code §1798.150(b), prior to the filing of this Complaint, on 22, 2021 Plaintiffs' counsel served Defendants with notice of these CCPA violations by certified mail, return receipt requested. Defendants failed to cure the violations detailed above and in Plaintiff's notice.

121.    Accordingly, Plaintiff Beyer seeks actual, punitive, and statutory damages, restitution, injunctive relief in the form of an order enjoining Defendants from continuing to violate the CCPA, and any other relief the Court deems proper as a result of Defendants' CCPA violations.

**COUNT V**
**Violations of the California Customer Records Act**
**Cal. Civ. Code §§ 1798.80, *et seq*. ("CCRA")**

122.    Plaintiffs reallege and incorporate all previous allegations as though fully set forth herein.

123.    "[T]o ensure that personal information about California residents is protected," the California legislature enacted Civil Code § 1798.81.5, which requires that any business that "owns or licenses personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."

124.    By failing to implement reasonable measures to protect the Plaintiff Beyer's Personal Information, Defendants violated Civil Code § 1798.81.5.

125.    In addition, by failing to promptly notify all affected Class members that their Personal Information had been exposed, Defendants violated Civil Code § 1798.82.

126.    As a direct or proximate result of Defendants' violations of Civil Code §§ 1798.81.5 and 1798.82, Plaintiff Beyer and Class members were (and continue to be) injured and have suffered (and will continue to suffer) the damages and harms described herein.

127.    In addition, by violating Civil Code §§ 1798.81.5 and 1798.82, Defendants "may be enjoined" under Civil Code Section 1798.84(e).

128.     Defendants' violations of Civil Code §§ 1798.81.5 and 1798.82 also constitute unlawful acts or practices under the UCL, which affords the Court discretion to enter whatever orders may be necessary to prevent future unlawful acts or practices.

129.     Plaintiff Beyer accordingly requests that the Court enter an injunction requiring Defendants to implement and maintain reasonable security procedures, including, but not limited to: (1) ordering that Accellion cease support of, and that Flagstar and Accellion end the use of the FTA platform; (2) ordering that Defendants utilize strong industry standard data security measures and file transfer software for the transfer and storage of customer data; (3) ordering that Defendants, consistent with industry standard practices, engage third party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis; (4) ordering that Defendants engage third party security auditors and internal personnel, consistent with industry standard practices, to run automated security monitoring; (5) ordering that Defendants audit, test and train its security personnel regarding any new or modified procedures; (6) ordering that Defendants, consistent with industry standard practices, segment consumer data by, among other things, creating firewalls and access controls so that if one area of Defendants' systems are compromised, hackers cannot gain access to other portions of those systems; (7) ordering that Defendants purge, delete, and destroy in a reasonably secure manner Class member data not necessary for its provisions of services; (8) ordering that Defendants, consistent with industry standard practices, conduct regular database scanning and security checks; (9) ordering that Defendants, consistent with industry standard practices, evaluate all file transfer and other software, systems, or programs utilized for storage and transfer of sensitive Personal Information for vulnerabilities to prevent threats to customers; (10) ordering that Defendants, consistent with industry standard practices, periodically conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and (11) ordering Defendants to meaningfully educate its customers about the threats they face as a result of the loss of their Personal Information to third parties, as well as the steps Defendants' customers must take to protect themselves.

130.     Plaintiff further requests that the Court require Defendant Accellion to identify all of its impacted clients other than Flagstar, and to identify and notify all members of the Class who have not

yet been informed of the Data Breach, and to notify affected persons of any future data breaches by email within 24 hours of discovery of a breach or possible breach and by mail within 72 hours.

## COUNT VI
### Violations of the California Unfair Competition Law
### Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL")

131.  Plaintiffs reallege and incorporate all previous allegations as though fully set forth herein.

132.  Defendants engaged in unfair and unlawful business practices in violation of the UCL.

133.  Plaintiff Beyer suffered injury in fact and lost money or property as a result of Defendants' alleged violations of the UCL.

134.  The acts, omissions, and conduct of Defendants as alleged constitute a "business practice" within the meaning of the UCL.

**<u>Unlawful Prong</u>**

135.  Defendants violated the unlawful prong of the UCL by violating, without limitation, the CCPA, CCRA, and CLRA, as alleged herein.

136.  Defendant Flagstar violated the unlawful prong of the UCL by failing to honor the terms of its implied contracts with Plaintiff Beyer and Class members in California, as alleged herein.

137.  Defendants' conduct also undermines California public policy—as reflected in statutes like the California Information Practices Act, Cal. Civ. Code §§ 1798, *et seq.*, the CCPA concerning consumer privacy, and the CCRA concerning customer records—which seek to protect customer and consumer data and ensure that entities who solicit or are entrusted with personal data utilize reasonable security measures.

**<u>Unfair Prong</u>**

138.  Defendants' acts, omissions, and conduct also violate the unfair prong of the UCL because Defendants' acts, omissions, and conduct, as alleged herein, offended public policy and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiff Beyer and other Class members in California. The gravity of Defendants' conduct outweighs any potential benefits attributable to such conduct and there were reasonably available alternatives to further Defendants' legitimate business interests, other than Defendants' conduct described herein.

139.    Defendants' failure to utilize, and to disclose that they do not utilize, industry standard security practices but, instead, utilize the unsecured FTA platform, constitutes an unfair business practice under the UCL. Defendant's conduct is unethical, unscrupulous, and substantially injurious to the Class. While Defendants' competitors have spent the time and money necessary to appropriately safeguard their products, service, and customer information, Defendants have not—to the detriment of its customers and to competition.

**Fraudulent Prong**

140.    By failing to disclose that it does not enlist industry standard security practices and utilized the unsecured FTA platform despite it being a legacy product that was known to be vulnerable, all of which rendered Class members particularly vulnerable to data breaches, Defendant Flagstar Bank engaged in UCL-violative practices.

141.    A reasonable consumer would not have banked or otherwise transacted with Flagstar if they knew the truth about its security procedures and that it used a third-party vendor, i.e., Accellion, for file transfers that utilize unsecured transfer applications. By withholding material information about its security practices, Flagstar was able to obtain customers who provided and entrusted their Personal Information in connection with banking with Flagstar. Had Plaintiff Beyer known the truth about Flagstar's security procedures and that it does busines with Accellion using Accellion's unsecured FTA, Plaintiff would not have done business with Flagstar.

142.    As a result of Defendants' violations of the UCL, Plaintiff Beyer and Class members in California are entitled to injunctive relief including, but not limited to: (1) ordering that Accellion cease support of, and that Flagstar and Accellion end the use of the FTA platform; (2) ordering that Defendants utilize strong industry standard data security measures and file transfer software for the transfer and storage of customer data; (3) ordering that Defendants, consistent with industry standard practices, engage third party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis; (4) ordering that Defendants engage third party security auditors and internal personnel, consistent with industry standard practices, to run automated security monitoring; (5) ordering that Defendants audit, test and train its security personnel regarding any new or modified procedures; (6) ordering that

Defendants, consistent with industry standard practices, segment consumer data by, among other things, creating firewalls and access controls so that if one area of Defendants' systems are compromised, hackers cannot gain access to other portions of those systems; (7) ordering that Defendants purge, delete, and destroy in a reasonably secure manner Class member data not necessary for its provisions of services; (8) ordering that Defendants, consistent with industry standard practices, conduct regular database scanning and security checks; (9) ordering that Defendants, consistent with industry standard practices, evaluate all file transfer and other software, systems, or programs utilized for storage and transfer of sensitive Personal Information for vulnerabilities to prevent threats to customers; (10) ordering that Defendants, consistent with industry standard practices, periodically conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and (11) ordering Defendants to meaningfully educate its customers about the threats they face as a result of the loss of their Personal Information to third parties, as well as the steps Defendants' customers must take to protect themselves.

143.   As a result of Defendants' violations of the UCL, Plaintiff and Class members have suffered injury in fact and lost money or property, as detailed herein. They agreed to bank or transact business with Flagstar, or made purchases or spent money that they otherwise would not have made or spent, had they known the truth. Class members lost Personal Information, which is their property. Class members lost money as a result of dealing with the fallout of the Data Breach, including, among other things, negative credit reports, the value of time they expended monitoring their credit and transactions, resolving fraudulent charges, and resolving issues that resulted from the fraudulent charges and replacement of cards.

144.   Plaintiff Beyer requests that the Court issue sufficient equitable relief to restore Class members in California to the position they would have been in had Defendants not engaged in violations of the UCL, including by ordering restitution of all funds that Defendants may have acquired from Plaintiff and Class members in California as a result of those violations.

## COUNT VII
### Violations of the California Consumers Legal Remedies Act
### Cal. Civ. Code §§ 1750, *et seq.* ("CLRA")
### (Against Flagstar Defendants Only)

145.    Plaintiffs reallege and incorporate all previous allegations as though fully set forth herein.

146.    The CLRA proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale of goods or services to any consumer."

147.    Flagstar is a "person" within the meaning of the CLRA. Cal. Civ. Code §§ 1761(c).

148.    Flagstar provides "services", sells "goods", or offers "services furnished in connection with the sale . . . of goods" within the meaning of the CLRA. Cal. Civ. Code §§ 1761(a), (b).

149.    Plaintiff Beyer and Class members in California are "consumers" within the meaning of the CLRA. Cal. Civ. Code §§ 1761(d).

150.    Plaintiff and Class members engaged in "transactions" with Flagstar within the meaning of the CLRA. Cal. Civ. Code §§ 1761(e).

151.    Flagstar engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of "services" and "goods" (as defined in the CLRA) in violation of the CLRA, including but not limited to the following:

- failing to maintain sufficient security to keep Plaintiff's and Class members' confidential and sensitive Personal Information from being exposed and stolen;

- misrepresenting and omitting material facts to the Class, in connection with the sale and provision of banking services, by misrepresenting that Flagstar would (or omitting that it would not) maintain adequate data privacy and security practices and procedures to safeguard Class members' personal information from unauthorized disclosure, release, data breaches, and theft;

- misrepresenting and omitting material facts to the Class, in connection with the sale and provision of banking services, by representing that Flagstar did and

-28-

SECOND AMENDED CLASS ACTION COMPLAINT

would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Class members' Personal Information;

- failing to prevent the Data Breach and promptly notify consumers thereof, and violating Cal. Civ. Code § 1798.80, *et seq.*; and

- failing to take proper action following the breach to make victims of the Data Breach whole and enact adequate privacy and security measures and protect Class members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

152.    In addition, Flagstar's failure to disclose that it transacted business with Accellion using the unsecured FTA platform and that Plaintiff's and Class members' sensitive information was vulnerable and susceptible to intrusion and cyberattacks constitutes deceptive and/or unfair acts or practices because Flagstar knew such facts would (a) be unknown to and not easily discoverable by Plaintiff and the Class; and (b) defeat Plaintiff's and Class members' ordinary, foreseeable, and reasonable expectations concerning the security of Flagstar's data storage and transfer processes, programs, and policies.

153.    Flagstar intended that Plaintiff and the Class rely on its deceptive and unfair acts and practices, misrepresentations, and the concealment, suppression, and omission of material facts, in connection with offering banking services and incorporating Plaintiff's and Class members' sensitive information on its computer servers, in violation of the CLRA.

154.    Flagstar also engaged in unfair acts and practices by failing to maintain the privacy and security of Class members' personal information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the data breach. These unfair acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45), the CCPA, and the CCRA.

155.    Flagstar's wrongful practices occurred in the course of trade or commerce.

156.    Flagstar's wrongful practices were and are injurious to the public interest because those practices were part of a generalized course of conduct on the part of Flagstar that applied to all Class members in California and were repeated continuously before and after Flagstar obtained confidential

SECOND AMENDED CLASS ACTION COMPLAINT

financial and personal data concerning Plaintiff and Class members. All Class members in California have been adversely affected by Flagstar's conduct and the public was and is at risk as a result thereof.

157.    As a result of Flagstar's wrongful conduct, Plaintiff and Class members in California were injured in their business or property in that they never would have allowed their sensitive and personal data – property that they have now lost – to be provided to Flagstar if they had been told or knew that Flagstar failed to maintain sufficient security to keep such data from being hacked and taken by others, and that it was engaging Accellion for the use of its legacy, end-of-life FTA platform that was known to Accellion and Flagstar to be unsecured and vulnerable to breaches.

158.    Flagstar's unfair and/or deceptive conduct proximately caused Plaintiff's and Class members' injuries because, had Flagstar maintained their Personal Information with adequate security, Plaintiff and the Class members would not have lost it.

159.    Flagstar knew, should have known, or was reckless in its conduct and failure to keep Plaintiff's and Class members' private information secure.

160.    Pursuant to § 1782 of the CLRA, on March 22, 2021 Plaintiff notified Flagstar in writing by certified mail of the particular violations of § 1770 of the CLRA and demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to so act.

161.    Flagstar has failed to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to § 1782 of the Act. Accordingly, Plaintiff Beyer seeks actual, punitive, and statutory damages, and a Court order enjoining the above-described wrongful acts and practices of Flagstar.

162.    Pursuant to § 1780(d) of the Act, attached hereto as **Exhibit A** is the affidavit showing that this action has been commenced in the proper forum.

**COUNT VIII**
**Violations of the Utah Consumer Sales Practices Act**
**Utah Code §§ 13-11-1, *et seq.* ("UCSPA")**
**(Against Flagstar Defendants Only)**

163.    Plaintiffs reallege and incorporate all previous allegations as though fully set forth herein.

164.    Plaintiff Hauser and Flagstar are "persons," as defined by Utah Code § 13-11-1(5).

165.    Flagstar is a "supplier," as defined by Utah Code § 13-11-1(6), because it regularly solicits, engages in, or enforces "consumer transactions," as defined by Utah Code § 13-11-1(2).

166.    Flagstar engaged in deceptive and unconscionable acts and practices in connection with consumer transactions, in violation of UCSPA, including:

      a.    Failing to implement and maintain reasonable security and privacy measures to protect the PII of Plaintiff Hauser and Class members in Utah, which was a direct and proximate cause of the data breach;

      b.    Failing to vet and properly evaluate the file transfer services provided by its third party vendor, Defendant Accellion;

      c.    Failing to identify foreseeable security and privacy risks and remediate identified security and privacy risks, which was a direct and proximate cause of the data breach;

      d.    Failing to comply with, and omitting, concealing, and suppressing noncompliance with, common law and statutory duties pertaining to the security and privacy of Plaintiff Hauser and Class members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, the GLBA, 15 U.S.C. § 6801, et seq., and the Utah Protection of Personal Information Act, Utah Code § 13-44- 201, which was a direct and proximate cause of the data breach; and

      e.    Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff Hauser and Class members' PII.

167.    Flagstar intended to mislead Plaintiff Hauser and Class members and induce them to rely on its omissions.

168.    Flagstar's omissions were material because they were likely to deceive reasonable consumers about the adequacy of Flagstar's data security and ability to protect the confidentiality of PII.

169.    Had Flagstar disclosed to Plaintiff Hauser and Class members that its customers' PII was vulnerable to attack, it would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law.

SECOND AMENDED CLASS ACTION COMPLAINT

170.     Flagstar had a duty to disclose the above facts due to the circumstances of this case, and the sensitivity and extensivity of the PII in its possession. Flagstar's duty to disclose arose from its possession of exclusive knowledge regarding the security of the data in its systems, and its active concealment of the state of its security.

171.     Flagstar intentionally or knowingly engaged in deceptive acts or practices, violating Utah Code § 13-11-4(2) by: indicating that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not; indicating that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not; indicating that the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not.

172.     Flagstar engaged in unconscionable acts and practices that were oppressive and led to unfair surprise, and unjustly imposed hardship on Plaintiff and the Class by imposing on them, through no fault of their own, an increased and imminent risk of fraud and identity theft; substantial cost in time and expenses related to monitoring their financial accounts for fraudulent activity; and lost value of their PII. The deficiencies in Flagstar's data security, and the material omissions concerning those deficiencies, led to unfair surprise to Plaintiff Hauser and the Class when the FTA Data Breach occurred.

173.     As a direct and proximate result of Flagstar's unconscionable and deceptive acts or practices, Plaintiff Hauser and Class members in Utah have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Personal Information.

174.     Flagstar's violations present a continuing risk to Plaintiff and Class members as well as to the general public.

175.     Plaintiff Hauser and Class members in Utah seek all monetary and non- monetary relief allowed by law, including actual damages, statutory damages of $2,000 per violation, amounts necessary to avoid unjust enrichment, under Utah Code §§ 13-11-19, et seq.; injunctive relief; and reasonable attorneys' fees and costs.

176.    In accordance with Utah Code § 13-11-21(2), counsel for Plaintiffs will mail by certified mail with return receipt requested a copy of this Complaint to the Utah Division of Consumer Protection.

## COUNT IX
### Violations of the Texas Deceptive Trade Practices Act
### Tex. Bus. & Com. Code §§ 17.41, *et seq.*("DTPA")
### (Against Flagstar Defendants Only)

177.    Plaintiffs reallege and incorporate all previous allegations as though fully set forth herein.

178.    Defendants' conduct as alleged herein constitutes false, misleading, or deceptive trade acts or practices in violation of the DTPA.

179.    Plaintiff Tyer and Flagstar are "persons" as defined by Tex. Bus. & Com. Code § 17.45(3).

180.    Flagstar provided Plaintiff Tyer and Class members in Texas with services under Tex. Bus. & Com. Code § 17.45(1).

181.    Plaintiff Tyer and members of the Class are "consumers" as defined In Tex. Bus. & Com. Code § 17.45(4). Flagstar has at all relevant times engaged in "trade" and "commerce" as defined in Tex. Bus. & Com. Code § 17.45(6), by advertising, offering for sale, and selling banking and mortgage services in Texas, directly or indirectly affecting Texas citizens through that trade and commerce.

182.    By failing to disclose that its data security was inadequate and that Flagstar contracted with Accellion without properly vetting Accellion and its file transfer product FTA, Flagstar engaged in deceptive business practices prohibited by the DTPA, including engaging in acts or practices which are unfair, misleading, false, or deceptive to the consumer.

183.    As alleged herein, Flagstar omitted material information about its data security and privacy, and the security of Plaintiff Tyer's and Class members' data in Flagstar's possession.

184.    Flagstar owed Plaintiff Tyer and the other Class members a duty to disclose that its data security was inadequate, that the FTA put Plaintiff and Class members at risk of a breach, and that Flagstar did not vet Accellion and the FTA.

185.    To their detriment, Plaintiff Tyer and members of the Class relied upon Defendant's material omissions concerning its inadequate data security and failure to employ prudent vetting

SECOND AMENDED CLASS ACTION COMPLAINT

processes to vet third party vendors, which Flagstar failed to disclose to induce Plaintiff Tyer and members of the Class to act, i.e., transact business with Flagstar.

186.     Flagstar's concealment of and failure to disclose to Plaintiff Tyer and Class members that it was susceptible to a breach and put PII at risk constitutes an "unconscionable action or course of action" under Tex. Bus. & Com. Code § 17.45(5) because, to the detriment of Plaintiff Tyer and the other Class members, that conduct took advantage of their lack of knowledge, ability, and experience to a grossly unfair degree.

187.     That "unconscionable action or course of action" was a producing cause of the economic damages sustained by Plaintiff Tyer and the other Class members.

188.     As a result of Defendant's unlawful acts in violation of the DTPA detailed above, Plaintiff Tyer and the Class sustained damages and are, therefore, entitled to damages and other relief as provided under the DTPA.

189.     Plaintiff Tyer and the other Class members in Texas also seek recovery of treble damages as additional statutory damages under the DTPA pursuant to§ 17.50(b)(1), as the acts and omissions of Flagstar alleged above were committed intentionally and/or knowingly. Awarding treble damages in this case is necessary to encourage private enforcement of Texas's consumer protection laws. Pursuant to § 17.50(d), Plaintiff Tyer and the Class also request recovery of costs and attorneys' fees, and any other relief the Court deems proper, as permitted by the DTPA.

## COUNT X
### Violations of the Michigan Consumer Protection Act
### Mich. Comp. Laws Ann. §§ 445.901 *et seq.* ("MCPA")
### (Against Flagstar Defendants Only)

190.     Plaintiffs reallege and incorporate all previous allegations as though fully set forth herein.

191.     Plaintiff Burton and Class members in Michigan are "persons" as defined by MCPA § 445.903(d).

192.     Flagstar advertised, offered, or sold goods or services in Michigan and engaged in trade or commerce directly or indirectly affecting the people of Michigan. MCPA § 445.903(g).

193.     Flagstar engaged in unfair, unconscionable, and deceptive practices in the conduct of trade and commerce, in violation of MCPA § 445.903(1), including:

-34-

a.  representing that its services have characteristics, uses, and benefits that they do not have;

b.  representing that its services are of a particular standard or quality if they are of another;

c.  making a representation or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and

d.  failing to reveal facts that are material to the transaction in light of representations of fact made in a positive matter.

MCPA § 445.903(1)(c), (e), (b)(b), (c)(c):

194.  Flagstar engaged in these violations of the MCPA by engaging in, *inter alia*, the following unfair, unconscionable, and deceptive acts and practices in connection with consumer transactions:

a.  Failing to implement and maintain reasonable security and privacy measures to protect the PII of Plaintiff Burton and Class members in Michigan, which was a direct and proximate cause of the data breach;

b.  Failing to vet and properly evaluate the file transfer services provided by its third party vendor, Defendant Accellion;

c.  Failing to identify foreseeable security and privacy risks and remediate identified security and privacy risks, which was a direct and proximate cause of the data breach;

d.  Failing to comply with, and omitting, concealing, and suppressing noncompliance with, common law and statutory duties pertaining to the security and privacy of Plaintiff Burton and Class members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, the GLBA, 15 U.S.C. § 6801, *et seq.*, which was a direct and proximate cause of the data breach; and

e.  Omitting, suppressing, and concealing the material fact that it did not reasonably

-35-

SECOND AMENDED CLASS ACTION COMPLAINT

or adequately secure Plaintiff Burton and Class members' PII.

195.    Flagstar intended to mislead Plaintiff Burton and Class members and induce them to rely on its omissions.

196.    Flagstar's omissions were material because they were likely to deceive reasonable consumers about the adequacy of Flagstar's data security and ability to protect the confidentiality of PII.

197.    Had Flagstar disclosed to Plaintiff Burton and Class members that its customers' PII was vulnerable to attack, it would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law.

198.    Flagstar engaged in unfair, deceptive, and unconscionable acts and practices that were oppressive and led to unfair surprise, and unjustly imposed hardship on Plaintiff Burton and the Class by imposing on them, through no fault of their own, an increased and imminent risk of fraud and identity theft; substantial cost in time and expenses related to monitoring their financial accounts for fraudulent activity; and lost value of their PII. The deficiencies in Flagstar's data security, and the material omissions concerning those deficiencies, led to unfair surprise to Plaintiff Burton and the Class when the FTA Data Breach occurred.

199.    As a direct and proximate result of Flagstar's unfair, deceptive, and unconscionable acts or practices, Plaintiff Burton and Class members in Michigan have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Personal Information.

200.    Plaintiff Burton and Class members seek all monetary and non-monetary relief available, including the greater of actual damages or $250, restitution, injunctive and equitable relief, and any other relief this Court deems proper.

## COUNT XI
### Invasion of Privacy (Intrusion Upon Seclusion)

201.    Plaintiffs reallege and incorporate all previous allegations as though fully set forth herein.

202.    Plaintiffs and Class members had a reasonable expectation of privacy in the Personal Information that Defendants disclosed without authorization.

203.    By failing to keep Plaintiffs' and Class members' Personal Information safe, knowingly utilizing the unsecure FTA platform, and disclosing Personal Information to unauthorized parties for unauthorized use, Defendants unlawfully invaded Plaintiffs' and Class members' privacy by, *inter alia*:

        a.    intruding into Plaintiffs' and Class members' private affairs in a manner that would be highly offensive to a reasonable person; and

        b.    invading Plaintiffs' and Class members' privacy by improperly using their Personal Information properly obtained for a specific purpose for another purpose, or disclosing it to some third party;

        c.    failing to adequately secure their Personal Information from disclosure to unauthorized persons;

        d.    enabling the disclosure of Plaintiffs' and Class members' Personal Information without consent.

204.    Defendants knew, or acted with reckless disregard of the fact that, a reasonable person in Plaintiffs' and Class members' position would consider its actions highly offensive.

205.    Defendants knew that Accellion's FTA platform was vulnerable to data breaches prior to the Data Breach.

206.    Defendants invaded Plaintiffs' and Class members' right to privacy and intruded into Plaintiffs' and Class members' private affairs by disclosing their Personal Information to unauthorized persons without their informed, voluntary, affirmative, and clear consent.

207.    As a proximate result of such unauthorized disclosures, Plaintiffs' and Class members' reasonable expectations of privacy in their Personal Information was unduly frustrated and thwarted. Defendants' conduct amounted to a serious invasion of Plaintiffs' and Class members' protected privacy interests.

208.    In failing to protect Plaintiffs' and Class members' Personal Information, and in disclosing Plaintiffs' and Class members' Personal Information, Defendants acted with malice and oppression and in conscious disregard of Plaintiffs' and Class members' rights to have such information kept confidential and private.

209.    Plaintiffs seek injunctive relief on behalf of the Class, restitution, and all other damages available under this Count.

**COUNT XII**
**Unjust Enrichment**
**(Against Flagstar Defendants Only)**

210.    Plaintiffs reallege and incorporate all previous allegations as though fully set forth herein.

211.    Flagstar has profited and benefited from the monies or fees paid by Plaintiffs and Class members to receive services from Flagstar.

212.    Flagstar has voluntarily accepted and retained these profits and benefits with full knowledge and awareness that, as a result of the misconduct and omissions described herein, Plaintiffs and Class members did not receive services of the quality, nature, fitness, or value represented by Flagstar and that reasonable consumers expected.

213.    Flagstar has been unjustly enriched by its withholding of and retention of these benefits, at the expense of Plaintiffs and Class members.

214.    Equity and justice militate against permitting Flagstar to retain these profits and benefits.

215.    Plaintiffs and Class members suffered injury as a direct and proximate result of Flagstar's unjust enrichment and seek an order directing Flagstar to disgorge these benefits and pay restitution to Plaintiffs and Class members.

**<u>PRAYER FOR RELIEF</u>**

Plaintiffs, individually and on behalf of the Classes, by and through undersigned counsel, respectfully request that the Court grant the following relief:

A.    Certify this case as a class action pursuant to Fed. R. Civ. P. 23, and appoint Plaintiffs as class representatives and undersigned counsel as class counsel;

B.    Award Plaintiffs and Class Members actual and statutory damages, punitive damages, and monetary damages to the maximum extent allowable;

C.    Award declaratory and injunctive relief as permitted by law or equity to assure that Class Members have an effective remedy, including enjoining Defendant from continuing the unlawful practices as set forth above;

D.      Award Plaintiffs and Class Members pre-judgment and post-judgment interest to the maximum extent allowable;

E.      Award Plaintiffs and Class Members reasonable attorneys' fees, costs, and expenses, as allowable; and

F.      Award Plaintiffs and Class Members such other favorable relief as allowable under law or at equity.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  September 1, 2021                Respectfully submitted,

*/s/ Tina Wolfson*
TINA WOLFSON (SBN 174806)
*twolfson@ahdootwolfson.com*
ROBERT AHDOOT (SBN 172098)
*rahdoot@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Telephone:  310.474.9111
Facsimile:   310.474.8585

ANDREW W. FERICH *(pro hac vice* to be filed)
*aferich@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Telephone:  310.474.9111
Facsimile:   310.474.8585

*Attorneys for Plaintiffs and the Proposed Classes*

-39-

# EXHIBIT A

TINA WOLFSON (SBN 174806)
*twolfson@ahdootwolfson.com*
ROBERT AHDOOT (SBN 172098)
*rahdoot@ahdootwolfson.com*
THEODORE MAYA (SBN 223242)
*tmaya@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Telephone:  310.474.9111
Facsimile:  310.474.8585

ANDREW W. FERICH *(pro hac vice* to be filed)
*aferich@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Telephone:  310.474.9111
Facsimile:  310.474.8585

*Attorneys for Plaintiff and the Proposed Class*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GRACE BEYER, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>  v.<br><br>FLAGSTAR BANCORP, INC. d/b/a FLAGSTAR BANK and ACCELLION, INC.,<br><br>    Defendants. | Case No.<br><br>**DECLARATON OF TINA WOLFSON PURSUANT TO CALIFORNIA CIVIL CODE § 1780(d)** |

I, TINA WOLFSON, declare as follows:

1.     I am a partner with the law firm of Ahdoot & Wolfson, PC, and one of counsel for Plaintiff Grace Beyer in the above-captioned action. I am admitted to practice law in California and before this Court and am a member in good standing of the State Bar of California. This declaration is made pursuant to California Civil Code § 1780(d). I make this declaration based on my research of public records and upon personal knowledge and, if called upon to do so, could and would testify competently thereto.

2.     Plaintiff Grace Beyer is a resident of Chula Vista, California.

3.     Venue is proper in this Court because, *inter alia,* Flagstar transacts substantial business, have agents, and are otherwise located in this District; and a substantial part of the conduct giving rise to Plaintiff's claims occurred in this judicial District.

4.     Plaintiff engaged in transactions with Defendant Flagstar Bank ("Flagstar") within the meaning of the Consumers Legal Remedies Act ("CLRA"). Cal. Civ. Code. §§ 1761(e).

5.     Flagstar routinely conducts substantial business in this District, has agents in this District, and is otherwise located in this District.  Flagstar provides "services", sells "goods", or offers "services furnished in connection with the sale . . . of goods" within the meaning of the CLRA. Cal. Civ. Code §§ 1761(a), (b) and which are the subject of this action. Flagstar Bank has intentionally availed itself of the laws and markets of this District.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 30th day of March, 2021, at Los Angeles, California.


By:   */s/ Tina Wolfson*
          TINA WOLFSON

- 1 -

DECLARATION OF TINA WOLFSON PUSUANT TO CALIFORNIA CIVIL CODE § 1780(d)