TINA WOLFSON (SBN 174806)
*twolfson@ahdootwolfson.com*
ROBERT AHDOOT (SBN 172098)
*rahdoot@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Tel: 310.474.9111; Fax: 310.474.8585

ANDREW W. FERICH (*pro hac vice* pending)
*aferich@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Tel:  310.474.9111; Fax: 310.474.8585

*Attorneys for Plaintiffs and the Proposed Class*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GRACE BEYER, CHRISTOPHER HAUSER, CHARLES TYER, and STEFANIE BURTON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FLAGSTAR BANCORP, INC., FLAGSTAR BANK, FSB, and ACCELLION, INC.,<br><br>Defendants. | Case No. 5:21-cv-02239-EJD<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>DATE:    January 20, 2022<br>TIME:     9:00 A.M.<br>JUDGE:   Hon. Edward J. Davila<br>CTRM:    4, 5th Floor<br><br>[Class Action Settlement Agreement and the Declarations of Cameron Azari, Robert Siciliano, and Tina Wolfson filed concurrently herewith] |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on January 20, 2022, at 9:00 a.m., in Courtroom 4 of the United States District Court for the Northern District of California, Robert F. Peckham Federal Building & United States Courthouse, 280 South 1st Street, San Jose, 95113, the Honorable Edward J. Davila presiding, Plaintiffs will and hereby do move for an Order for Preliminary Approval of Class Action Settlement.

This motion is based upon this Notice of Motion and Motion, the supporting Memorandum set forth below and the attached exhibits attached, the pleadings and records on file in this Action, and other such matters and argument as the Court may consider at the hearing of this motion.

Respectfully submitted,

Dated: September 3, 2021

By: */s/ Tina Wolfson*
TINA WOLFSON (SBN 174806)
*twolfson@ahdootwolfson.com*
ROBERT AHDOOT (SBN 172098)
*rahdoot@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Tel:  310.474.9111; Fax:  310.474.8585

ANDREW W. FERICH (*pro hac vice* pending)
*aferich@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Tel:  310.474.9111; Fax: 310.474.8585

*Attorneys for Plaintiffs and the Proposed Class*

- 1 -

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF THE ISSUES TO DECIDED ...................................................1

II.   INTRODUCTION ...........................................................................................1

III.  BACKGROUND .............................................................................................3

 A.   The FTA Data Breach and Subsequent Litigation.....................................3

 B.   Mediation and Settlement Negotiations....................................................6

 C.   Information Learned Prior to the Mediation and Through Confirmatory
  Discovery ..............................................................................................8

IV.   TERMS OF THE SETTLEMENT ....................................................................11

 A.   The Class Definition .............................................................................11

 B.   The Release .........................................................................................11

 C.   The Settlement Benefits.........................................................................11

  1.   Credit Monitoring and Insurance Services .................................12

  2.   Documented Loss Payment ......................................................12

  3.   Cash Fund Payments................................................................12

  4.   Prospective Relief and Changes in Business Practices Attributable to the
   Settlement ..............................................................................13

  5.   The Settlement's Value to Settlement Class Members.............................13

 D.   Plan of Distribution...............................................................................13

 E.   Residual ..............................................................................................14

 F.   Notice to Class .....................................................................................15

 G.   Proposed Class Representative Service Payments.....................................16

 H.   Attorneys' Fees and Expenses ...............................................................16

 I.   The Settlement Administrator..................................................................17

V.    PRELIMINARY APPROVAL IS APPROPRIATE .............................................17

 A.   The Rule 23 Requirements for Class Certification are Met.........................17

  1.   Rule 23(a) Is Satisfied ............................................................18

   i.   The Class Is Sufficiently Numerous.............................18

   ii.   There Are Common Questions of Law and Fact ...........................18

   iii.   The Class Representatives' Claims Are Typical .........................18

iv. Class Representatives and Proposed Class Counsel Adequately Represent Class Members ................................................. 19

2. Rule 23(b)(3) is Satisfied ....................................................... 20

i. Common Issues of Law and Fact Predominate Over Any Potential Individual Questions ................................................................. 20

ii. A Class Action is the Superior Method to Fairly and Efficiently Adjudicate the Matter ............................................................... 21

B. The Proposed Settlement Is Eminently Fair, an Excellent Result for the Class Members, and Should be Preliminarily Approved ................................. 22

1. The Strength of Plaintiffs' Case and Possible Monetary Remedies .......... 23

2. The Risk, Expense, Complexity, and Potential Class Recovery .............. 24

3. The Risk of Maintaining Class Status Through Trial ........................... 26

4. The Amount Offered in Settlement Is Fair ....................................... 26

5. The Proposed Method of Distribution Is Highly Effective ..................... 28

6. The Extent of Discovery Completed and the Stage of the Proceedings .... 29

7. The Experience and Views of Counsel ........................................... 30

8. The Presence of a Governmental Participant .................................... 30

9. The Reaction of Class Members to the Proposed Settlement .................. 31

10. The Settlement Is the Product of Arm's-Length Negotiations that Were Free of Collusion ................................................................... 31

11. The Proposed Notice Plan is Appropriate ....................................... 32

12. Appointment of Settlement Class Counsel ..................................... 34

13. Settlement Deadlines and Schedule for Final Approval ....................... 35

VI. CONCLUSION ................................................................................. 35

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**CASES**

*Abante Rooter & Plumbing, Inc. v. Pivotal Payments Inc.,*
4          2018 WL 8949777 (N.D. Cal. Oct. 15, 2018) ...................................................20

5   *Alvarez v. Sirius XM Radio Inc.,*
           2020 WL 7314793 (C.D. Cal. July 15, 2020) ...................................................19
6
    *Amchem Prods., Inc. v. Windsor,*
7          521 U.S. 591, 117 S.Ct. 2231 (1997) .......................................................17, 21

8   *Campbell v. Facebook, Inc.,*
           951 F.3d 1106 (9th Cir. 2020)...................................................................28
9
    *Corcoran et al. v. CVS Health Corporation,*
10         No. 4:15-CV-03504 (N.D. Cal. June 24, 2021) ...................................................24

11  *Ellis v. Costco Wholesale Corp.,*
           657 F.3d 970 (9th Cir. 2011)....................................................................18
12
    *G. F. v. Contra Costa Cnty.,*
13         2015 WL 4606078 (N.D. Cal. July 30, 2015) ...................................................32

14  *Hammond v. The Bank of N.Y. Mellon Corp.,*
           2010 WL 2643307 (S.D.N.Y. June 25, 2010).....................................................25
15
    *In re Anthem, Inc. Data Breach Litig.,*
16         327 F.R.D. 299 (N.D. Cal. 2018) .......................................................20, 22

17  *In re Banner Health Data Breach Litigation,*
           No. 2:16-cv-02696-PHX-SRB (D. Ariz. Dec. 5, 2019) ..........................................31
18
    *In re Bluetooth Headset Prods. Liab. Litig.,*
19         654 F.3d 935 (9th Cir. 2011)..........................................................22, 23, 31, 32

20  *In re Emulex Corp. Sec. Litig.,*
           210 F.R.D. 717 (C.D. Cal. 2002) ...................................................................19
21
    *In re Equifax Inc. Customer Data Sec. Breach Litig.,*
22         2020 WL 256132 (N.D. Ga. Mar. 17, 2020).......................................................24

23  *In re Experian Data Breach Litigation,*
           No. 8:15-cv-01592-AG-DFM (N.D. Cal. May 10, 2019) ..........................................22
24
    *In re Premera Blue Cross Customer Data Sec. Breach Litig.,*
25         2019 WL 3410382 (D. Or. July 29, 2019) ...................................................31

26  *In re Prudential Ins. Co. of Am. Sales Practices Litig.,*
           962 F. Supp. 450 (D.N.J. 1997).................................................................33
27
    *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.,*
28         895 F.3d 597 (9th Cir. 2018)....................................................................19

iii

*In re Yahoo! Inc. Cust. Data Sec. Breach Litig.*,
    No. 5:16-md-02752-LHK (N.D. Cal. July 20, 2019) .........................................................22

*Just Film, Inc. v. Buono*,
    847 F.3d 1108 (9th Cir. 2017) ......................................................................................21

*Kent v. Hewlett-Packard Co.*,
    2011 WL 4403717 (N.D. Cal. Sept. 20, 2011) ..............................................................19

*Krottner v. Starbucks Corp.*,
    406 Fed.Appx. 129 (9th Cir. 2010) ...............................................................................25

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ........................................................................................18

*Mullane v. Cent. Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950) ......................................................................................................33

*Phillips Co. v. Shutts*,
    472 U.S. 797 (1985) ......................................................................................................21

*Pruchnicki v. Envision Healthcare Corp.*,
    845 F. App'x 613 (9th Cir. 2021).................................................................................25

*Sandoval v. Roadlink USA Pac., Inc.*,
    2011 WL 5443777 (C.D. Cal. Oct. 9, 2011) ................................................................17

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) .................................................................................................21

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002).......................................................................................16

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ......................................................................................................18

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir.) ....................................................................................................32

*Warner v. Toyota Motor Sales, U.S.A., Inc.*,
    2016 WL 8578913 (C.D. Cal. Dec. 2, 2016).................................................................33

*Wershba v. Apple Computer, Inc.*,
    91 Cal.App.4th 224 (2001)............................................................................................33

*Wright v. Linkus Enters., Inc.*,
    259 F.R.D. 468 (E.D. Cal. 2009)...................................................................................23

## STATUTES

28 U.S.C. § 1715...............................................................................................................31
28 U.S.C. § 1407.................................................................................................................5
Cal. Civ. Code § 1798.150(a)(1) ......................................................................................26

# RULES

Fed. R. Civ. P. 23 ........................................................................................................................17
Fed. R. Civ. P. 23, Adv. Comm. Notes to 2018 Amendment ....................................................17
Fed. R. Civ. P. 23(b) ...................................................................................................................18
Fed. R. Civ. P. 23(b)(3) .........................................................................................................20, 21
Fed. R. Civ. P. 23(c)(2)(B) .....................................................................................................32, 34
Fed. R. Civ. P. 23(e) .............................................................................................................*passim*
Fed. R. Civ. P. 23(e)(2)...........................................................................................................2, 22
Fed. R. Civ. P. 23(e)(2)(C)(ii) .....................................................................................................28
Fed. R. Civ. P. 23(g)(1)(A)(i-iv) ..................................................................................................34
Fed. R. Civ. P. 23(g)(1)(B) ...........................................................................................................34

# OTHER AUTHORITIES

4 NEWBERG ON CLASS ACTIONS § 11:53 (4th ed. 2013) ...............................................................33
MANUAL FOR COMPLEX LITIGATION § 30.212 (4th ed. 2004) …………………………………33

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    STATEMENT OF THE ISSUES TO DECIDED

Whether the proposed Settlement warrants: (a) preliminary approval; (b) certification of a Settlement Class; (c) dissemination of Notice to the Settlement Class Members ("Class Members") of the Settlement's terms in the proposed method using the proposed forms; (d) appointment of Ahdoot & Wolfson, PC as Class Counsel and of Plaintiffs Grace Beyer, Christopher Hauser, Charles Tyer, and Stefanie Burton ("Plaintiffs") as Class Representatives; and (e) setting a Fairness Hearing for final approval of the Settlement and a hearing to consider any application for Service Payments, attorneys' fees, and reimbursement of expenses.

### II.    INTRODUCTION

Plaintiffs request that the Court preliminarily approve a nationwide class action settlement ("Settlement" or "Settlement Agreement" filed concurrently with this Motion) with Defendants Flagstar Bancorp, Inc. and Flagstar Bank, FSB (together "Flagstar"), that would resolve all class claims against only Flagstar, on behalf of nearly 1.48 million Class Members relating to Accellion's File Transfer Appliance ("FTA") Data Breach (the "FTA Data Breach").[1]

The Settlement would establish a non-reversionary cash fund of $5.9 million to pay for valid claims, notice and administration costs, Service Payments to the named Plaintiffs, and any attorneys' fees and costs awarded by the Court. Claimants may elect to receive: (1) three years of Credit Monitoring and Insurance Services ("CMIS"); or (2) a cash payment, calculated in accordance with the terms of the Settlement Agreement (with double the amount to California residents because of the statutory claims available to them), estimated at $632 to $199 for California Claimants and $316 to $99 for all other Claimants (at 1% to 3% claims rates); or (3) a payment for reimbursement of Documented Losses of up to $10,000. The Settlement also provides for robust injunctive relief to be implemented for a period of five years following final approval of the Settlement, including, *inter alia*, confirming that Class Members' sensitive personally identifiable information ("PII") is secured; dark web monitoring for fraudulent activity relating to Class

---

[1] Unless otherwise noted, all capitalized terms not separately defined here have the meaning ascribed to them in the Settlement Agreement.

Members' PII; and various enhancements to Flagstar's third-party vendor risk management program and other data privacy enhancements. Flagstar has also agreed to certify compliance with these injunctive relief measures.

The Settlement is the product of arduous, arms-length negotiations between experienced counsel after comprehensive investigation and informal exchange of information, two mediation sessions with The Hon. Judge Jay C. Gandhi (Ret.) of JAMS, weeks of negotiations, and substantial confirmatory discovery. It is the result of a double-blind mediator's proposal made at the second mediation session, on July 26, 2021, followed by numerous hours over the subsequent month, into early September, negotiating and finalizing the Settlement details so as to maximize the benefits to the Class Members.

The Settlement resolves claims against Flagstar only (and no other party) and, if approved, would release all claims against Flagstar in: *Angus, et al. v. Flagstar Bank, FSB*, No. 2:21-cv-10657-AJT-DRG (E.D. Mich.) ("*Angus*"), which has been consolidated with three other cases filed against Flagstar in the Eastern District of Michigan—*Garcia v. Flagstar Bank, FSB*, No. 2:21-cv-10671-AJT-DRG, *Burdick v. Flagstar Bank, FSB*, No. 2:21-cv-10786-AJT-DRG, and *Hawkins, et al. v. Flagstar Bank*, No. 2:21-cv-11165-AJT-DRG (collectively, the "Michigan Actions"; *see, infra*, Sec. III.A.); and *Pollard v. Accellion, Inc., et al.*, No. 5:21-cv-02572-EJD (N.D. Cal.) ("*Pollard*").

The Settlement delivers tangible and immediate benefits to the Settlement Class that address all the potential harms of the FTA Data Breach suffered by Class Members without protracted class action litigation and the attendant serious inherent risks of such litigation. The Settlement compares favorably to previous settlements in data breach class actions and delivers a fair, adequate, and reasonable resolution for the Class. Fed. R. Civ. P. 23(e)(2). The Court should preliminarily approve the Settlement.

1

2

### III.    BACKGROUND

#### A.    The FTA Data Breach and Subsequent Litigation

In late 2020 and early 2021, Accellion began disclosing to its FTA clients that certain threat actors had breached Accellion client data via vulnerabilities in the FTA software. Second Amended Class Action Complaint ("SAC"), ECF No. 50, ¶¶ 2-8. These threat actors were then able to steal sensitive data from many Accellion clients, including corporations, law firms, banks, universities, and other entities. *Id.* ¶ 35. As part of the FTA Data Breach, hackers accessed Flagstar's files containing Plaintiffs' and Class Members' sensitive PII. *Id.* ¶¶ 41-48.

On or about March 6, 2021, Flagstar publicly acknowledged that it was one of the Accellion clients impacted by the FTA Data Breach. *Id.* ¶ 43. Flagstar has confirmed that the PII of 1,477,411 Flagstar customers (including Persons whose mortgages are serviced by Flagstar) and employees was compromised in the Data Breach. Concurrently filed Declaration of Tina Wolfson ("Wolfson Decl.") ¶ 28(g). The affected PII included names, email addresses, dates of birth, home addresses, phone numbers, Social Security numbers, passport information, and account information. *Id.*; SAC ¶ 1. Flagstar began providing notice of the FTA Data Breach to impacted Class Members on March 15, 2021. Wolfson Decl. ¶ 28(f).

On March 30, 2021, this action was filed on behalf of Plaintiff Grace Beyer, naming Accellion and Flagstar as co-defendants. ECF No. 1. Plaintiff Beyer filed the First Amended Class Action Complaint ("FAC") on April 23, 2021. ECF No. 24. On September 1, 2021, Plaintiffs filed the operative SAC. ECF No. 50.[2] Each of the Plaintiffs received notification from Flagstar indicating that their PII was accessed during the FTA Data Breach. SAC ¶¶ 13-16.

Plaintiffs allege that, *inter alia*, Flagstar and Accellion: (a) failed to implement and maintain adequate data security practices to safeguard Plaintiffs' and Class Members' PII; (b) failed to prevent the FTA Data Breach; (c) failed to detect security vulnerabilities leading to the FTA Data Breach; and (d) failed to disclose that their data security practices were inadequate to safeguard

---

[2]  The SAC adds Plaintiffs Christopher Hauser and Charles Tyer, who were plaintiffs in a separately filed class action previously pending in the Eastern District of Michigan against Flagstar only, entitled *Tyer, et al. v. Flagstar Bank, FSB, et al.*, No. 2:21-cv-11652-AJT-DRG (E.D. Mich.) ("*Tyer*"). The *Tyer* action was voluntarily dismissed on July 29, 2021. *Tyer*, ECF No. 6. The SAC also adds Plaintiff Stefanie Burton.

Class Members' PII. *Id.* ¶¶ 66-72. With respect to Flagstar, Plaintiffs allege that Flagstar had a duty to, and impliedly promised Plaintiffs and Class Members that it would, protect their sensitive PII from unauthorized disclosure and handle this data securely, and that it failed to do so by entrusting the PII to a third-party file transfer vendor whose products and services were prone to security vulnerabilities that left Class Members' PII exposed. *E.g., id.* ¶¶ 90, 184

Plaintiffs' allegations include claims for negligence, negligence per se, breach of implied contract, violations of the California Consumer Privacy Act ("CCPA"), violations of the California Customer Records Act ("CCRA"), violations of the California Unfair Competition Law ("UCL"), violations of the California Consumers Legal Remedies Act ("CLRA"), violations of the Utah Consumer Sales Practices Act, violations of the Texas Deceptive Trade Practices Act, violations of the Michigan Consumer Protection Act, invasion of privacy, and unjust enrichment. *Id.* ¶¶ 84-215. Plaintiffs seek certification of a nationwide class. *Id.* ¶ 77.

Flagstar has steadfastly denied all such allegations and responded to Plaintiffs' CCPA demand letter that it had cured any violation of the statute, promptly sent notice of the breach, and confirmed that it will be offering two years of credit and identity monitoring. Wolfson Decl. ¶ 11. Flagstar also states that it reported the incident to law enforcement and initiated its own investigation. *Id.*

Following commencement of this action, counsel for Plaintiffs and Flagstar began a dialogue about case management issues and engaged in multiple meet-and-confer discussions. *Id.* ¶ 13. Plaintiffs' counsel already had been engaging in efforts to coordinate all the class action cases filed in this District relating to the FTA Data Breach, including drafting a stipulation to consolidate those cases and set deadlines for submitting leadership applications. *Id.* Some of the plaintiffs' counsel in the Michigan Actions who also had cases against Accellion pending before this Court would not join the consolidation stipulation. When efforts to consolidate failed, Plaintiff Beyer filed a motion to consolidate ("Motion to Consolidate") the numerous FTA Data Breach-related class actions pending before this Court, and to set deadlines for filing a Consolidated Complaint and leadership applications, in an effort to coordinate and organize the FTA Data Breach litigation.

1   *Brown, et al. v. Accellion, Inc.*, No. 5:21-cv-01155-EJD, ECF No. 37 (filed April 7, 2021). The

2   Motion to Consolidate is pending before the Court.

3       In view of the fact that many cases relating to the FTA Data Breach continued to be filed in

4   multiple courts, on March 31, 2021, Plaintiff Beyer had also filed a motion for transfer and

5   centralization pursuant to 28 U.S.C. § 1407 with the United States Judicial Panel on Multidistrict

6   Litigation, seeking to transfer numerous FTA Data Breach-related actions in four district courts to

7   this Court for centralized proceedings. *In re Accellion, Inc., Data Breach Litigation*, MDL No. 3002

8   (J.P.M.L. 2021), at ECF No. 1 ("JPML Motion"). Prior to filing the JPML Motion, Plaintiffs'

9   counsel contacted some of the counsel in the Michigan Actions and attempted to informally

10  coordinate the litigation against Flagstar occurring in two separate district courts, but counsel in the

11  Michigan Actions declined, expressing a preference to litigate against Flagstar in Michigan.

12  Contrary to their representations to the JPML, counsel in the Michigan Actions never contacted

13  Plaintiffs' counsel to coordinate any issue either prior or after the ruling on the JPML motion.

14  Wolfson Decl. ¶ 14.

15      During the pendency of the Motion to Consolidate and the JPML Motion, dialogue between

16  counsel for Plaintiffs and Flagstar continued. *Id*. ¶ 15. On April 19, 2021, Plaintiff Beyer and

17  Flagstar submitted a stipulation in this action extending Flagstar's time to respond to the initial

18  complaint to the earlier of 45 days following denial of the JPML Motion, or 45 days following the

19  denial of the Motion to Consolidate or the filing of a Consolidated Complaint. ECF No. 14. On

20  April 23, 2021, Plaintiff Beyer filed the FAC. ECF No. 24. On June 7, 2021, the Panel issued an

21  order denying transfer. MDL No. 3002, ECF No. 88. On June 16, 2021, following the Panel's order,

22  Plaintiff Beyer and Flagstar stipulated to toll Flagstar's deadline to respond to the FAC until after

23  a decision is issued on the Motion to Consolidate. ECF No. 39. On September 1, 2021, Plaintiffs

24  filed the SAC. ECF No. 50.

25      As stated above, this Settlement would resolve all claims in the Michigan Actions and in

26  *Pollard*. On June 14, 2021, the attorneys in the *Angus* Michigan Action filed a Consolidated Class

27  Action Complaint. *Angus*, ECF No. 18. On June 26, 2021, the attorneys in the *Angus* Michigan

28

Action filed a motion pursuant to Rule 23(g), seeking to appoint a large 8-firm leadership structure. *Id.*, ECF No. 22. On July 6, 2021, counsel in the *Hawkins* Michigan Action filed a motion seeking to consolidate *Angus* and *Hawkins* pursuant to Rule 42(a), and to appoint plaintiffs' counsel in *Hawkins* as interim class counsel pursuant to Rule 23(g). *Id.*, ECF No. 27.

The court granted the Rule 23(g) motion of the attorneys in the *Angus* Michigan Action at a July 16, 2021 status conference[3] and later approved their leadership structure in a July 30, 2021 order. *Id.*, ECF No. 33.

After the Parties reached this settlement, on July 28, 2021, Flagstar filed a motion to stay the Michigan Actions pending disposition of nationwide class settlement proceedings in this action. *Id.*, ECF No. 30. Plaintiffs' counsel in the Michigan Actions have opposed the motion to stay. *Id.*, ECF No. 34. A video conference hearing on the motion to stay is scheduled for September 9, 2021. *Id.*, ECF No. 43.

**B.    Mediation and Settlement Negotiations**

As discussed *supra,* as a result of their continued meet-and-confer efforts, the Parties were able to reach an agreement to participate in mediation to attempt to resolve this matter. Wolfson Decl. ¶ 17.

Prior to any mediation, Flagstar and Plaintiffs' counsel voluntarily exchanged information to prepare for and facilitate a productive mediation session. *Id.* ¶ 18. These Parties also exchanged and submitted to the mediator detailed confidential mediation briefs laying out their respective positions on the merits of the case and settlement. *Id.* Plaintiffs received and analyzed data from Flagstar relating to the impact of the FTA Data Breach on Flagstar, including specific information concerning the categories of individuals who received breach notification letters from Flagstar (e.g.,

---

[3]  As discussed above, Plaintiffs' counsel filed the *Tyer* action in Michigan. *See supra* fn. 2. They did so intending to file (and having apprised that court of their intention to file) a lead counsel motion; however, the court appointed *Angus* counsel as lead counsel during a status conference on July 16, 2021, without providing Plaintiffs' counsel with an opportunity to file their lead counsel motion and without a hearing. During the July 16 status conference, neither Plaintiffs' counsel or counsel for plaintiffs in *Angus* apprised the court of the then-ongoing settlement negotiations and mediation in this litigation. Plaintiffs' counsel subsequently voluntarily dismissed the *Tyer* action pursuant to Rule 41 in order to include Plaintiffs Tyer and Hauser in this Settlement.

customers, employees), the nature of the PII impacted, and the number of Class Members impacted. Wolfson Decl. ¶ 18.

On July 13, 2021, the Parties participated in a mediation session with Judge Gandhi of JAMS by video conference. *Id*. ¶ 19. Counsel for *Angus* attended the mediation. *Id*. With Judge Gandhi's guidance, the Parties had a productive mediation session with both sides zealously represented by experienced counsel; however, the Parties were not able to reach an agreement to settle this matter. *Id*. In the weeks following the first mediation session, counsel for Flagstar and Plaintiffs' counsel continued a dialogue about early resolution and continued to discuss a potential settlement. *Id*. Flagstar and Plaintiffs' counsel ultimately reached an agreement to return to mediation. *Id*.

On July 26, 2021, the Flagstar and Plaintiffs' counsel participated in a second mediation session with Judge Gandhi. *Id*. ¶ 20. Counsel for *Angus* was not invited and did not attend. *Id.* After many hours, Judge Gandhi proposed a double-blind mediator's proposal of a $5.9 million non-reversionary common fund, which accepted by both sides. *Id*. Plaintiffs' counsel accepted the mediator's proposal at the second mediation because it is in the best interest of the Class, for all the reasons set forth in this Motion. *Id*.

Following the mediation, the Parties continued to work together to finalize the Settlement's terms. *Id*. ¶ 21. During this time, the Parties exchanged drafts of the Settlement Agreement and its exhibits as they negotiated numerous details to maximize the benefits to the Class. *Id*.

Counsel solicited competing bids and negotiated with three separate third-party administrators for settlement notice and administration. *Id*. ¶ 22. Counsel ultimately negotiated an agreement with Epiq Class Action and Claims Solutions, Inc. ("Epiq"), which estimates that the total administration and notice charges in this matter will be approximately $442,000 to $475,000. *Id.* ¶ 22. This estimate is reasonable in the context of this proposed Settlement, and includes all costs associated with providing direct notice, class member data management, CAFA notification, telephone support, claims administration, creation and management of the Settlement Website, disbursements and tax reporting, and includes postage (which is estimated to be approximately

$190,000 to $200,000). Wolfson Decl. ¶ 22. Plaintiffs' counsel also solicited competing bids from alternative providers of CMIS. *Id*. Ultimately, counsel negotiated for Equifax to provide CMIS. Wolfson Decl. ¶ 22 and Ex. 1 (for details of the features of the CMIS); *see also* Settlement Agreement ("SA") § 4.2.1.

During the Settlement negotiations process, the Parties deferred any discussion concerning the maximum Service Payments to be sought by the proposed Class Representatives until after reaching an agreement on all material terms of the Settlement. Wolfson Decl. ¶ 36. There has been no negotiation and no agreement as to the amount of attorneys' fees and expenses to be sought by proposed Class Counsel. *Id*. Negotiations regarding the Settlement have been conducted at arm's length, in good faith, free of any collusion, and under the supervision of Judge Gandhi. *Id*. ¶ 32.

After comprehensive negotiations and diligent efforts, Plaintiffs and Flagstar finalized the terms of the Settlement, and now seek preliminary approval of the Settlement from the Court.

C. **Information Learned Prior to the Mediation and Through Confirmatory Discovery**

Prior to attending the mediation, Plaintiffs conducted a thorough investigation and received requested information from Flagstar informally. *Id.* ¶ 28. The Parties engaged in detailed confirmatory discovery, which established the following facts.

Flagstar is a national, full-service bank that must comply with governing cybersecurity and data privacy regulations, including those from the Office of the Comptroller of the Currency (OCC), the Gramm-Leach-Bliley Act (GLBA), and the Federal Financial Institutions Examinations Council (FFIEC). *Id*. ¶ 28(a).

Flagstar entered into an agreement with Accellion in 2015 to license the FTA and renewed the FTA license through 2020. *Id.* ¶ 28(b). Flagstar understood that Accellion's FTA would enable Flagstar to safely and securely transfer large files containing sensitive information, including PII, using industry-standard encryption, and Flagstar knew that many other major businesses, including financial institutions, used the FTA platform. Wolfson Decl. ¶ 28(b).

In 2020, Flagstar decided to migrate from the FTA platform to Kiteworks (Accellion's newer FTA product) for the 2021 calendar year. *Id.* Flagstar states that the decision to migrate to

1   Kiteworks was based on new functionality in the Kiteworks platform, and because Accellion

2   informed Flagstar that the FTA platform would eventually be decommissioned, though Accellion

3   did not disclose to Flagstar when that would happen. *Id.* Flagstar also confirmed that Accellion was

4   still fully supporting FTA under a support contract, and that Flagstar's migration to Kiteworks was

5   underway on January 20, 2021. *Id.* According to Flagstar, it had no reason to believe the FTA

6   product was not secure or ill-suited for the purpose of providing securing file transfers, or that it

7   was susceptible to a breach. *Id.*

8       According to Flagstar, in December 2020, threat actors exploited multiple zero-day

9   vulnerabilities in the FTA, but Accellion was able to patch this first attack. *Id.* ¶ 28(c). On January

10  12, 2021, Accellion's CISO Frank Balonis confirmed that the December breach was contained,

11  patched, and that Flagstar was not impacted at this juncture. *Id.*

12      Accellion later reported to Flagstar that, on January 20, 2021, threat actors subsequently

13  exploited two more zero-day vulnerabilities as part of a continued attack, enabling the threat actors

14  to exfiltrate data stored on the FTA systems of Accellion's clients. *Id*. During this attack, Flagstar's

15  FTA system was breached and its data was impacted. *Id*.

16      On January 22, Flagstar received a critical security alert from Accellion, prompting Flagstar

17  to permanently discontinue its use of the FTA. *Id*. ¶ 28(d). On January 23, Accellion provided

18  Flagstar with a list of malicious IP addresses, and Flagstar promptly blocked those addresses from

19  its systems. *Id*. On January 24, Accellion confirmed that all four of its servers were compromised

20  by the second exploit. *Id*. At that time, Accellion did not have the tools yet to identify if an actual

21  breach of data had occurred. *Id.* Flagstar engaged a third-party security incident response vendor to

22  conduct additional forensics to determine whether data was exfiltrated. *Id*. Separately, Accellion

23  hired Mandiant, a U.S. based cyber security firm, to conduct a forensic analysis, and later posted

24  its report on the Accellion website.[4] Flagstar's post-breach analyses of the FTA system confirmed

25  that Flagstar was breached between January 20 and 22. Wolfson Decl. ¶ 28(d).

26

27  [4]  ACCELLION, INC., FILE TRANSFER APPLIANCE (FTA) SECURITY ASSESSMENT, (2021),
    https://www.accellion.com/sites/default/files/trust-center/accellion-fta-attack-mandiant-report-
28  full.pdf (last accessed Sep. 2, 2021).

Between January 26 and 28, Accellion provided Flagstar with a log of files that had been downloaded from the FTA during the breach, and Flagstar engaged Kroll to investigate the breach and perform a detailed forensic review of the FTA. *Id*. ¶ 28(e). On January 27, Flagstar's Chief Information Security Officer and Privacy Officer Zahira Gonzalvo informed the Office of the Comptroller of Currency (OCC) of the breach and Flagstar's remediation steps. *Id*. That same day, a threat actor demanded a ransom. *Id*. On January 29, Ms. Gonzalvo filed a criminal complaint with the Federal Bureau of Investigations (FBI) reporting the ransom demand. *Id*.

On March 6, after Flagstar's third-party forensic experts determined the extent of the information compromised in the breach, Flagstar publicly announced the data breach in an email to customers. *Id*. ¶ 28(f). Flagstar began sending out data breach notification letters to impacted persons in mid-March 2021. *Id*.

In total, Flagstar identified and sent notices to 1,477,411 individuals whose PII was compromised in the breach. *Id*. ¶ 28(g). The PII exposed varies by individual but in many cases included name (all individuals, though some are first name only), Social Security Number (1,463,707 individuals), address (1,343,678 individuals), phone number (932,926 individuals), and account number (628,605 individuals). *Id*. A smaller number of individuals had their email address (13,617 individuals), date of birth (10,129 individuals), credit card number (238 individuals), and passport number (29 individuals) exposed. *Id*. Within California, Flagstar identified and sent notices to 257,660 individuals whose PII was compromised in the breach, which included 256,993 individuals whose exposed PII included Social Security Number. *Id*. The overall affected population included approximately 6,901 current and former employees of Flagstar whose PII was exposed from employee data files that were on the Accellion FTA. *Id*.

Flagstar secured the services of Kroll to provide identity monitoring services, including credit monitoring, fraud consultation, and identity theft restoration, to affected individuals at no cost for two years. Wolfson Decl. ¶ 28(h).

In response to the FTA Data Breach and in connection with the proposed Settlement, Flagstar has taken or is taking the following steps to strengthen the security of its systems:

confirming termination of the FTA platform, which was discontinued on January 23, 2021; migrating to Kiteworks by February 12, 2021, and soliciting bids for alternative solutions to Accellion's products; implementing additional automated compliance with Flagstar's data retention policies on file-sharing platforms to ensure data will be auto-deleted after thirty days; deploying additional endpoint detection response tools, which provide Flagstar with an added layer of visibility to potential cybersecurity anomalies; and requesting Flagstar's managed security services provider to add at least daily threat-hunting services to detect any Flagstar data exposed on the dark web. *Id*. ¶ 28(i); *see also* SA § 4.1.

## IV.    TERMS OF THE SETTLEMENT

### A.    The Class Definition

The proposed Settlement Class is defined as follows:

> [A]ll residents of the United States who were notified by Flagstar that their PII was compromised as a result of the FTA Data Breach. Excluded from the Settlement Class are: (1) the Judges presiding over the Action and members of their families; (2) Flagstar and Accellion, their subsidiaries, parent companies, successors, predecessors, and any entity in which Flagstar or Accellion, or their parents, have a controlling interest, and their current or former officers and directors; (3) Persons who properly execute and submit a Request for Exclusion prior to the expiration of the Opt-Out Period; and (4) the successors or assigns of any such excluded Persons.

SA § 1.4.5. The proposed Settlement Class is identical to the Nationwide Class defined in the SAC. SAC ¶ 77.

### B.    The Release

In exchange for the benefits provided under the Settlement Agreement, Class Members will release any claims against Flagstar only related to or arising from the FTA Data Breach SA § 3.5.1. Class Members do not release any claims they may have against Accellion, other Accellion clients, or any other parties or defendants related to the FTA Data Breach. The claims sought to be released by the Settlement are coextensive with the claims in the SAC.

### C.    The Settlement Benefits

The Settlement provides for a $5.9 million non-reversionary Settlement Fund (*id.* § 3.6.1) that will be used to provide Participating Class Members, at their choice, with one of the following Settlement Benefits:

1

### 1.     Credit Monitoring and Insurance Services

Each Participating Settlement Class Member who submits a valid claim may elect to receive CMIS. The CMIS protection plan will be provided by Equifax. SA § 4.2.1; Wolfson Decl. ¶ 23 and Ex. 1. If a Participating Settlement Class Member chooses CMIS as their respective Settlement Benefit and already maintains a subscription for a similar product, she will have the option to postpone the commencement of the CMIS by 12 months for no additional charge. SA § 4.2.1.

The CMIS protection plan provided by Equifax will include Credit Monitoring, Fraud Consultation, and Identity Theft Restoration services. *Id*. Specifically, the CMIS includes up to $1 million of identity theft insurance coverage and three-bureau credit monitoring that provides notice of changes to the Participating Settlement Class Member's credit profile. SA § 4.2.1; Wolfson Decl. ¶ 23 and Ex. 1. The retail value of this CMIS is $19.95 per month (a total of $718.20 for the entire three-year term) for each subscriber. Declaration of Robert Siciliano ("Siciliano Decl.") ¶¶ 5-6.

### 2.     Documented Loss Payment

In the alternative to the CMIS, Class Members may seek reimbursement of up to $10,000 of Documented Losses ("Document Loss Payment"). To receive a Documented Loss Payment, a Settlement Class Member must submit a valid Claim Form with attestation regarding the amount of the loss supported by reasonable documentary proof. SA § 4.2.3.

### 3.     Cash Fund Payments

In the alternative to CMIS or a Documented Loss Payment, Participating Class Members may submit a claim to receive a cash Settlement Payment ("Cash Fund Payment"). The amount of the Cash Fund Payment will be calculated in accordance with the terms of the Settlement Agreement. *Id.* §§ 4.2.2, 4.7; *see also, infra*, Sec. V.D. In view of the heightened protections afforded to California Class Members under the California statutory claims asserted in this lawsuit (i.e., the CCPA), California Class Members who submit valid claims for Cash Fund Payments will receive Settlement Payments that are twice the amount of Settlement Payments made to non-California Class Members. SA § 4.7.2.

The amount of the Cash Fund Payment depends on a number of factors. Assuming, however, that the claims rate here is between 1% and 3% (concurrently filed Declaration of Cameron R. Azari of Epiq ("Azari Decl.") ¶ 26; *see also, infra*, Sec. V.B.5, previous Data Breach Settlement claims rate chart), Class Counsel estimate that California Claimants will receive approximately $632 at 1%, $307 at 2%, and $199 at 3%, and non-California Claimants will receive approximately $316 at 1%, $153 at 2%, and $99 at 3%. Wolfson Decl. ¶ 26.

### 4. Prospective Relief and Changes in Business Practices Attributable to the Settlement

The Settlement also promises significant remedial measures that Flagstar has agreed to implement for a period of 5 years as a result of this litigation, which will benefit the Class Members whether or not they submit a claim. Flagstar has agreed to the following:

> "Flagstar will confirm that it has fully ended its use of the Accellion File Transfer Appliance and migrated to a new secure file transfer solution; . . . undertake measures to secure, or securely destroy if and when it is no longer needed for legitimate business purposes, all information that was subject to the FTA Data Breach, and confirm that this has been completed; . . . conduct annual reviews of third-party data transfer vendors' product(s) with respect to data security and privacy; . . . enhance its existing third-party vendor risk management program . . . ."

*Id.* §§ 4.1.1-4.1.4.

Furthermore, for five years after final approval of the Settlement, Flagstar will continue to monitor the dark web for indications of fraudulent activity with respect to data of Flagstar customers and current and former employees in connection with the FTA Data Breach. *Id.* § 4.1.5. Flagstar has also agreed to certify compliance with all injunctive and remedial relief measures provided for under the Settlement. *Id*. § 4.1.6.

### 5. The Settlement's Value to Settlement Class Members

The value of the Settlement is significant. The cash fund value of the Settlement is $5,900,000. SA §§ 1.49, 3.6. This does not include the value of the Settlement's prospective relief or the retail value of the CMIS claimed by Participating Settlement Class Members.

### D. Plan of Distribution

Subject to the Court's approval, the Settlement Administrator ("Administrator") will apply the Net Settlement Fund to make all distributions necessary for an election of CMIS, Documented

---

Loss Payments, and Cash Fund Payments. The Administrator will first apply the Net Settlement Fund to pay for claimed CMIS and then to pay for any valid claims for Documented Loss. SA § 4.7.1.

The amount of the Settlement Fund remaining after all payments for CMIS and Documented Loss Payments are applied (the "Post DC Net Settlement Fund"), will be used to pay valid claims for Cash Fund Payments. *Id*. § 4.7.2. The amount of each Cash Fund Payment shall be calculated by dividing the Post DC Net Settlement Fund by double the number of valid claims submitted by California residents added to the number of valid claims submitted by non-California residents to determine a "Initial Cash Amount." *Id*. The Cash Fund Payment amount to non-California residents with Approved Claims will be equal to the Initial Cash Amount, and the Cash Fund Payment to California residents with Approved Claims will equal twice the Initial Cash Amount. *Id*.

Settlement Class Claimants will have the option to receive any Settlement Payment available to them pursuant to the terms of the Settlement Agreement via digital PayPal, Venmo, and/or digital payment Card. *Id*. § 4.3; Azari Decl. ¶ 22. In the event Class Members do not exercise an electronic payment option, they will receive their Settlement Payment via a physical check, good to deposit or cash 60 days following distribution. SA §§ 4.3, 4.8. This plan is similar to past distribution plans recommended by proposed Class Counsel and approved by many courts. Wolfson Decl. ¶ 25.

**E.  Residual**

The Settlement Fund is non-reversionary. To the extent any monies remain in the Net Settlement Fund more than 150 days after the distribution of Settlement Payments, a subsequent Settlement Payment will be evenly made to all Claimants with Approved Claims who cashed or deposited the initial payment they received, assuming such payment is over $3.00. SA § 4.9. In the event such a payment is less than $3.00 for each Approved Claim for cash, the remaining funds will be used to extend the three-year term of the CMIS for as long as possible for all Claimants who selected CMIS. *Id.* Any amount remaining thereafter will be paid to the proposed Non-Profit Residual Recipient: the Electronic Frontier Foundation, a 26 U.S.C. 501(c)(3) non-profit

organization. *Id.* §§ 1.26, 4.9, 4.11. The Electronic Frontier Foundation's efforts are directly related to the subject matter of this action. Wolfson Decl. ¶ 27. Proposed Class Counsel have no relationship with the Electronic Frontier Foundation. *Id.*

**F.  Notice to Class**

Pursuant to Rule 23(e), the Administrator will provide Class Members with the Summary Notice via email for any Class Member for whom an email address is available, and via U.S. mail in postcard form for all other Class Members for whom a physical mailing address is available. SA §§ 6.3.1-6.3.2; Azari Decl. ¶¶ 13-14. If an email notice is returned undeliverable, the Administrator shall attempt two other email executions; if unsuccessful, the Administrator will send a post card Summary Notice via U.S. mail to the extent a current mailing address is available. SA § 6.3.3; Azari Decl. ¶¶ 14-15. For Summary Notices returned as undeliverable via U.S. mail, the Administrator will re-mail the notice to any forwarding address identified on the return mail. SA § 6.3.4; Azari Decl. ¶¶ 14-15.

For recipients of notice via email who have not submitted Claim Forms, the Administrator will periodically transmit reminder emails of the opportunity to submit a Claim Form prior to the Claims Deadline. SA § 6.6; Azari Decl. ¶ 16.

The Administrator also will design and conduct an internet digital advertising publication notice program, which will continue through the Claims Deadline. SA § 6.4; Azari Decl. ¶ 17.

The Administrator also will create and maintain a Settlement Website that contains all relevant information and documents regarding the Settlement (including the Long Form Notice, the Claim Form, the Settlement Agreement, Preliminary Approval documents, and the operative Complaint), through which Class Members can submit electronic Claims Forms and Requests for Exclusion. SA § 6.7; Azari Decl. ¶ 18. The Settlement Website will also contain a toll-free telephone number and mailing address through which Class Members can contact the Administrator. SA § 6.7; Azari Decl. ¶ 19. The language of all Notice Forms (Summary Notice, Long Form Notice, Claim Form, etc.) is easily understandable and takes into account the education level or language needs of the proposed Class Members. Azari Decl. ¶¶ 20-21.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### G.      Proposed Class Representative Service Payments

Plaintiffs have been dedicated and active participants on behalf of the class they seek to represent. They investigated the matter prior to and after retaining counsel, participated in the plaintiff vetting process implemented by their counsel, reviewed and approved complaints and the operative SAC, kept in close contact with counsel to monitor the progress of the litigation, and reviewed and communicated with their counsel regarding the Settlement. Wolfson Decl. ¶¶ 34-35. Each Plaintiff put their name and reputation on the line for the sake of the Class, and the recovery would not have been possible without their efforts. *Id.*

In view of these efforts, on behalf of Plaintiffs, counsel will separately petition the Court for approval of Service Payments in the amount of $1,500 for each of the four Plaintiffs. SA § 10.1. This amount is consistent with those approved in other data breach class action settlements.

### H.      Attorneys' Fees and Expenses

As part of the Settlement, Plaintiffs' counsel will separately file a motion for an award of reasonable attorneys' fees and reimbursement of litigation costs and expenses. *Id*. §§ 11.1-11.3. Notably, there is no "free sailing" clause in the Settlement (*id.*), and any amount sought for payment of attorneys' fees will be reasonable, and consistent with the Ninth Circuit's 25% "benchmark" percentage for such awards. *See, e.g.*, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002). Proposed Class Counsel have expended approximately $341,650 in lodestar and incurred $29,749.96 in expenses as August 15, 2021. Wolfson Decl. ¶ 37. Proposed Class Counsel are not yet certain whether, or in what amount, a multiplier will be sought as they expect a number of additional hours to be expended in this matter prior to the filing of a motion for fees and expenses. In no event will proposed Class Counsel seek more than 25% of the Settlement Fund in attorneys' fees. No portion of any awarded fees will revert to Flagstar. Proposed Class Counsel also intend to seek reimbursement of all expenses incurred to date. Any approved Fee Award and Costs will be paid by Flagstar out of the Settlement Fund. SA § 11.1. The Settlement is not conditioned upon the Court's approval of the Fee Award and Costs, or the proposed Service Payments. *Id.* § 11.3.

1

**I.    The Settlement Administrator**

The Parties propose that Epiq—an experienced and reputable national class action administrator—serve as Administrator to provide notice; administer and make determinations regarding claim forms; process settlement payments; make distributions; and provide other services necessary to implement the Settlement. SA § 1.43; *see generally* Azari Decl. The costs of the Administrator will be paid by Flagstar out of the Settlement Fund. SA § 3.8.

The Parties selected Epiq as the Administrator following a competitive bidding process led by proposed Class Counsel to identify the most efficient and lowest cost Settlement administration option for the benefit of Class Members. Wolfson Decl. ¶ 22. Proposed Class Counsel considered three different proposals from potential administrators. *Id*. With each of the potential settlement administrators, proposed Class Counsel discussed the notice and distribution plans agreed to in the Settlement. *Id*. Proposed Class Counsel—who has litigated hundreds of class actions to settlement since the 1990s—has previously worked with Epiq on different matters. *Id*. ¶¶ 22, 24-25. Proposed Class Counsel also has worked with the other nationally recognized administrators who submitted proposals for this Settlement. The estimated $442,000 to $475,000 cost for settlement administration is reasonable. *Id*.

**V.    PRELIMINARY APPROVAL IS APPROPRIATE**

**A.    The Rule 23 Requirements for Class Certification are Met**

Parties seeking class certification for settlement purposes must satisfy the requirements of Fed. R. Civ. P. 23. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). "A court considering such a request should give the Rule 23 certification factors 'undiluted, even heightened, attention in the settlement context.'" *Sandoval v. Roadlink USA Pac., Inc*., No. EDCV 10-00973, 2011 WL 5443777, at *2 (C.D. Cal. Oct. 9, 2011) (quoting *Amchem*, 521 U.S. at 621). At the preliminary approval stage, "if a class has not [yet] been certified, the parties must ensure that the court has a basis for concluding that it likely will be able, after the final hearing, to certify the class." Fed. R. Civ. P. 23, Adv. Comm. Notes to 2018 Amendment. All the requirements of Rule 23(a) must be

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

met, and "at least one of the three requirements listed in Rule 23(b)." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011).

### 1.    Rule 23(a) Is Satisfied

### i.    The Class Is Sufficiently Numerous

There are approximately 1,477,411 Settlement Class Members. Wolfson Decl. ¶ 28(g). The Rule 23(a)(1) numerosity requirement is satisfied.

### ii.    There Are Common Questions of Law and Fact

The commonality requirement is satisfied if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2); *see also Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012) (characterizing commonality as a "limited burden," which "only requires a single significant question of law or fact").

Here, numerous common issues of law and fact affect the Class uniformly, including: the nature of Flagstar's data security practices, whether Flagstar knew or should have known that Accellion's FTA was unsecure, whether Flagstar owed duties of care to Class Members to safeguard their PII, and whether Flagstar breached those duties. Resolution of these and other common inquiries can be achieved through to common evidence that does not vary from Class Member to Class Member. Commonality is satisfied.

### iii.    The Class Representatives' Claims Are Typical

Rule 23(a)(3) requires that the Class Representatives' claims be typical of those of the Class. "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other Class Members have been injured by the same course of conduct." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (internal quotation marks and citation omitted).

Here, the claims of the named Plaintiffs are typical of the claims of the Settlement Class. Plaintiffs are all individuals who were notified by Flagstar that their PII was impacted as a result of the breach; the Class Members are also individuals who were notified that their PII was impacted by the breach. Plaintiffs' and Class Members' claims arise from the same nucleus of facts relating

to the FTA Data Breach, pertain to common defendant Flagstar, and are based on the same legal theories. Plaintiffs thus satisfy the Rule 23(a)(3) typicality requirement.

### iv.  Class Representatives and Proposed Class Counsel Adequately Represent Class Members

Rule 23(a)(4) permits certification of a class action only if "the representative parties will fairly and adequately protect the interests of the class," which requires that the named plaintiffs (1) not have conflicts of interest with the proposed Class; and (2) be represented by qualified and competent counsel. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 895 F.3d 597, 607 (9th Cir. 2018).

Plaintiffs and proposed Class Counsel are adequate. First, the proposed Class Representatives have demonstrated that they are well-suited to represent the Settlement Class, have actively participated in the litigation, and will continue to do so. Wolfson Decl. ¶¶ 34-35. They do not have any conflicts of interest with the absent Class Members, as their claims are coextensive with those of the Class Members. *Id.*; *Kent v. Hewlett-Packard Co.*, No. 5:09-CV-05341, 2011 WL 4403717, at *1 (N.D. Cal. Sept. 20, 2011) (finding class representatives adequate where their claims coextensive were with those of absent class members, and they had no conflicts).

Second, proposed Class Counsel are highly qualified and experienced in class action and complex litigation, with expertise and extensive experience in data breach and data privacy class actions. Wolfson Decl. ¶¶ 38-52 and Ex. 2. Proposed Class Counsel have been dedicated to the prosecution of this action and will remain so through final approval. Among other actions, counsel identified and investigated the claims in this lawsuit and the underlying facts, spoke with numerous Class Members, engaged in multiple mediation and negotiation sessions with Flagstar, and successfully negotiated this Settlement. Wolfson Decl. ¶¶ 12-15, 17-21; *see also In re Emulex Corp. Sec. Litig.*, 210 F.R.D. 717, 720 (C.D. Cal. 2002) (a court evaluating adequacy of representation may examine "the attorneys' professional qualifications, skill, experience, and resources . . . [and] the attorneys' demonstrated performance in the suit itself"); *Alvarez v. Sirius XM Radio Inc.*, No. CV 18-8605, 2020 WL 7314793, at *8 (C.D. Cal. July 15, 2020) (adequacy of counsel satisfied

where class was "represented by Class Counsel who are experienced in class action litigation"). The adequacy requirement is satisfied.

### 2.      Rule 23(b)(3) is Satisfied

Rule 23(b)(3) requires that (1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members of the class," and (2) "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Both of these requirements are satisfied.

### i.      Common Issues of Law and Fact Predominate Over Any Potential Individual Questions

The Rule 23(b)(3) predominance element requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Here, Plaintiffs' claims depend on whether Flagstar had reasonable data security measures in place to protect Plaintiffs' and Class Members' PII, and whether Flagstar could have prevented unauthorized exposure of Plaintiffs' PII or mitigated its effects with more adequate third-party risk management practices. These questions can be resolved using the same evidence for all Class Members, including Flagstar's internal documents, testimony of its employees, and expert analysis. *Abante Rooter & Plumbing, Inc. v. Pivotal Payments Inc.*, No. 3:16-CV-05486, 2018 WL 8949777, at *5 (N.D. Cal. Oct. 15, 2018) ("Predominance is satisfied because the overarching common question . . . can be resolved using the same evidence for all class members and is exactly the kind of predominant common issue that makes certification appropriate.").

Indeed, the FTA Data Breach affected all Class Members in a uniform fashion, compromising the similar types of PII for Plaintiffs and the Settlement Class Members. *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 312 (N.D. Cal. 2018) (". . . Plaintiffs' case for liability depends, first and foremost, on whether Anthem used reasonable data security to protect Plaintiffs' personal information. . . . That question can be resolved using the same evidence for all Class Members because their personal information was all stored on the same Anthem data warehouse that was the subject of the breach.").

1    The issues presented are susceptible to common proof because they focus on Flagstar's

2  class-wide data security policies and practices, and thus are the type of predominant questions that

3  make a class-wide adjudication worthwhile. *Id.*; *see also Tyson Foods, Inc. v. Bouaphakeo*, 136 S.

4  Ct. 1036, 1045 (2016) ("When 'one or more of the central issues in the action are common to the

5  class and can be said to predominate, the action may be considered proper under Rule

6  23(b)(3) . . . .'" (citation omitted)). Predominance is satisfied.

7              ii.    **A Class Action is the Superior Method to Fairly and**
                       **Efficiently Adjudicate the Matter**

8       Rule 23(b)(3) requires a class action to be "superior to other available methods for the fair

9  and efficient adjudication of the controversy," and sets forth the following factors:

10       The matters pertinent to the findings include: (A) the class members' interest in
          individually controlling the prosecution or defense of separate actions; (B) the
11        extent and nature of any litigation concerning the controversy already begun by or
          against class members; (C) the desirability or undesirability of concentrating the
12        litigation of the claims in the particular forum; and (D) the likely difficulties in
          managing a class action.
13

14  Fed. R. Civ. P. 23(b)(3).

15       Where, as here, a court is deciding the certification question in the proposed class action

16  settlement context, it need not consider manageability issues because "the proposal is that there be

17  no trial," and hence manageability considerations are no hurdle to certification for purposes of

18  settlement. *Amchem*, 521 U.S. at 620.

19       A class action is the only reasonable method to fairly and efficiently adjudicate Class

20  Members' claims against Flagstar. *See, e.g.*, *Phillips Co. v. Shutts*, 472 U.S. 797, 809 (1985) ("Class

21  actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate

22  individually . . . [In such a case,] most of the plaintiffs would have no realistic day in court if a class

23  action were not available."). Resolution of the predominant issues of fact and law through

24  individual actions is impracticable: the amount in dispute for individual class members is too small,

25  the technical issues involved are too complex, and the required expert testimony and document

26  review too costly. *See Just Film, Inc. v. Buono,* 847 F.3d 1108, 1123 (9th Cir. 2017).

27       The class device is the superior method of adjudicating claims against Flagstar arising from

28  the FTA Data Breach because it promotes greater efficiency, and no realistic alternative exists.

1    Courts routinely recognize this in other data breach cases where class-wide settlements have been

2    approved. *See, e.g.*, *In re Experian Data Breach Litigation*, No. 8:15-cv-01592-AG-DFM (N.D.

3    Cal. May 10, 2019); *In re Yahoo! Inc. Cust. Data Sec. Breach Litig.*, No. 5:16-md-02752-LHK

4    (N.D. Cal. July 20, 2019).

### B. The Proposed Settlement Is Eminently Fair, an Excellent Result for the Class Members, and Should be Preliminarily Approved

6         The 2018 revisions to Rule 23 confirm the need for a detailed analysis regarding the fairness

7    of a proposed class settlement. "The claims, issues, or defenses of a certified class—or a class

8    proposed to be certified for purposes of settlement—may be settled . . . only with the court's

9    approval." Fed. R. Civ. P. 23(e). Accordingly, a district court may approve a settlement agreement

10   "after a hearing and only on finding that it is fair, reasonable, and adequate . . . ." Fed. R. Civ. P.

11   23(e)(2).

12        In making this decision, Rule 23(e)(2) clarifies that district courts must consider whether:

13   (A)     the class representatives and class counsel have adequately represented the class;

14   (B)     the proposal was negotiated at arm's length;

15   (C)     the relief provided for the class is adequate, taking into account:

16        (i)     the costs, risks, and delay of trial and appeal;

17        (ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

18        (iii)   the terms of any proposed award of attorney's fees, including timing of payment; and

19        (iv)    any agreement required to be identified under Rule 23(e)(3); and

20   (D) the proposal treats class members equitably relative to each other.

21   Fed. R. Civ. P. 23(e)(2). Thus, Rule 23(e) now reflects the factors that courts in this Circuit already

22   considered for settlement approval: "(1) the strength of the plaintiffs' case; (2) the risk, expense,

23   complexity, and likely duration of further litigation; (3) the risk of maintaining class action status

24   throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and

25   the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a

26   governmental participant; and (8) the reaction of the Class Members to the proposed settlement."

27   *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 317 (N.D. Cal. 2018) (quoting *In re*

28   *Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)).

"Prior to formal class certification, there is an even greater potential for a breach of fiduciary duty owed the class during settlement. Accordingly, such agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 946.

At the preliminary approval stage, the court "evaluate[s] the terms of the settlement to determine whether they are within a range of possible judicial approval." *Wright v. Linkus Enters., Inc.*, 259 F.R.D. 468, 472 (E.D. Cal. 2009). Ultimately, "[s]trong judicial policy favors settlements." *Churchill Village, L.L.C. v. General Electric,* 361 F.3d 566, 576 (9th Cir. 2003) (ellipses and quotation marks omitted) (quoting *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)).

### 1.     The Strength of Plaintiffs' Case and Possible Monetary Remedies

Plaintiffs believe they have a strong case for liability against Flagstar. The operative SAC details the shortcomings in Flagstar's data security measures. SAC ¶¶ 66-72. Plaintiffs allege that Accellion's FTA product at the heart of the FTA Data Breach was an unsecured, legacy, end-of-life product. *Id.* ¶ 30. Plaintiffs also allege that Accellion provided notice to its clients, like Flagstar, that a newer and more secure Accellion file transfer product called Kiteworks was available, and that clients should migrate to this product. *Id.* ¶¶ 32-33. While Flagstar was in the process of migrating to Kiteworks at the time of the breach, Flagstar did not promptly complete this process. *Id.* Plaintiffs also allege that Flagstar entrusted customer and employee PII to Accellion under a duty to make sure that the PII was secure. *Id.* ¶ 27.

Plaintiffs also believe that they would be able to recover damages on behalf of the Class. The range of potential outcomes is large, however. The scope of damages depends in large part on the scope of class certification, whether various theories of damages would be accepted by the Court (i.e., benefit of the bargain, and loss of value of PII), and which causes of action survive. Nonetheless, if applied across all potential class members equally, Plaintiffs' most conservative measure (based on black-market rates of at least $5 per individual for Social Security numbers[5])

---

[5] *See Premera, supra,* ECF No. 156, p. 20 of 24, Motion for Class Certification.

would yield a figure of approximately $7,350,000, while more expansive measure (based on at least $19.95 of monthly credit monitoring costs[6]) would yield $29,474,349.40 (1,477,411 x $19.95). Assuming the statutory damages available to the 257,660 California Class Members under the CCPA ($100 minimum, $750 maximum per violation), nominal damages to those individuals alone would range from $25,766,000 to $193,245,000.

These amounts are not certain, however, and the case is subject to numerous risks (*see, infra*, Sec. V.B.2.). Plaintiffs believe that the legal theories behind such larger damage figures are meritorious, but also recognize that they are untested. As a practical matter, Plaintiffs' counsel recognize that taking such large numbers to a jury presents substantial strategic risks. Even a number in the mid-hundreds of millions potentially risks offending a jury and leading to a nominal award—or no monetary award at all. *See, e.g., Corcoran et al. v. CVS Health Corporation*, No. 4:15-CV-03504, ECF No. 611 (N.D. Cal. June 24, 2021) (unanimous defense verdict where Plaintiffs' counsel urged jury to award 6.3 million CVS Pharmacy customers $121 million in generic drug price overcharge suit). Moreover, once damages are determined, the jury may be asked to apportion damages between Flagstar and Accellion, further reducing any award as to Flagstar.

## 2.     The Risk, Expense, Complexity, and Potential Class Recovery

This factor overwhelmingly weighs in favor of preliminary approval. As stated above, while Plaintiffs believe their case is a strong one, there is substantial risk. Data breach cases are, by nature, especially risky and expensive. Such cases also are innately complex. *See, e.g., In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800, 2020 WL 256132, at *32-33 (N.D. Ga. Mar. 17, 2020) (recognizing the complexity and novelty of issues in data breach class actions). This case is no exception to that rule. It involves nearly one-and-a-half million Settlement Class Members, complicated and technical facts, a well-funded and motivated defendant, and numerous contested issues on class certification and substantive defenses.

There are numerous substantial hurdles that Plaintiffs would have to overcome before the Court might find a trial appropriate. First, given the early stage of the litigation, the legal sufficiency of Plaintiffs' claims has not been tested by a motion to dismiss, including Article III standing.

---

[6] *See* Siciliano Decl. ¶ 5.

Establishing a cognizable injury tied to Flagstar's conduct (as opposed to, for instance, another data breach or some other cause) can present challenges. *See, e.g.*, *Krottner v. Starbucks Corp.*, 406 F.App'x 129 (9th Cir. 2010) (holding that, although plaintiffs established injury-in-fact for standing purposes, they failed to allege cognizable damages in a data breach case); *Pruchnicki v. Envision Healthcare Corp.*, 845 F. App'x 613, 614 (9th Cir. 2021) (affirming dismissal of data breach class action for failure to allege cognizable damages).

Data breach cases, particularly, face substantial hurdles in surviving even past the pleading stage and are among the most risky and uncertain of all class action litigation. *See, e.g.*, *Hammond v. The Bank of N.Y. Mellon Corp.*, No. 08 Civ. 6060, 2010 WL 2643307, at *1 (S.D.N.Y. June 25, 2010) (collecting cases). Flagstar likely would argue that certification is not appropriate for numerous reasons, including because the compromised Class Member PII is not uniform among class members. Flagstar also likely would argue that it is not liable because it retained Accellion in the first place (a purportedly secure third-party data transferor with a file transfer service), was never informed by Accellion that the FTA product was not secure and had purchased Kiteworks and was in the process migrating to that product. *See, supra*, Section III.C. Flagstar likely would argue that Accellion is solely at fault for the FTA Data Breach, and thus that Flagstar is not liable at all.

Were litigation to proceed, there would be numerous expert reports and costly depositions, which would present significant expenses. It is also not certain that the Court would approve Plaintiffs' damages theories. As in any data breach class action, establishing causation and damages on a class-wide basis is largely unchartered territory and full of uncertainty.

Plaintiffs' California CCPA claim also faces significant risk of dismissal on the pleadings or an unfavorable disposition at summary judgment. The CCPA is relatively new (effective only on January 1, 2020) and remains largely untested. Were this litigation to continue, Flagstar would attack Article III standing as well as the merits of this claim. For example, Flagstar would argue that it is immune under the CCPA's private cause of action provision, Cal. Civ. Code § 1798.150(a)(1), which states that liability may be found only where the unauthorized disclosure of

1   protected information occurs "as a result of the business's violation of the duty to implement and
2   maintain reasonable security procedures and practices. . . ." *Id.*

3         The unique circumstances of this Data Breach present additional risks of litigation. Flagstar
4   will argue that the fact that numerous other reputable business defendants, including giant retailers,
5   health insurers, and universities, vetted and used FTA supports a finding of no negligence. Further,
6   Accellion's role not only complicates a finding of negligence against Flagstar, but also deems
7   plaintiffs' damages subject to apportionment.

8         Plainly, the Settlement avoids the risk of non-recovery and is a prudent course in view of
9   these high risks. Given that all Class Members will be eligible to elect CMIS or cash payments, the
10  Settlement provides benefits that address all potential harms of a data breach without the substantial
11  risk of continued litigation, which includes the risk of dismissal or judgement against Plaintiffs.

12                    **3.       The Risk of Maintaining Class Status Through Trial**

13         Class certification proceedings are far off in the distance in this litigation, and prior to those
14  proceedings, there is risk of dismissal. Class certification, if and when it arrives, will present
15  substantial risk, particularly given that different types of information were affected for different
16  Class Members, and in light of the fact that class wide damage models remain largely untested at
17  litigation. If Plaintiffs obtained class certification, there is no guarantee that the class action status
18  would be maintained. Flagstar would likely seek a Rule 23(f) appeal of any decision by the Court
19  granting class certification, resulting in additional delay to Class Members. The significant risk of
20  obtaining and maintaining class certification in this case supports preliminary approval.

21                    **4.       The Amount Offered in Settlement Is Fair**

22         The $5.9 million non-reversionary Settlement Fund is an excellent result for the Class. With
23  this fund, all Class Members will be eligible for a Settlement Payment in the form of distribution
24  for the CMIS, Documented Loss Payment, or a Cash Fund Payment. SA §§ 4.2.1-4.2.3. The
25  Settlement Fund will be applied to pay all Administrative Expenses, Notice Expenses, the taxes to
26  the Settlement Fund, any Service Payments, and any payment of a Fee Award and Costs. *Id*. § 3.8.

27

28

Any funds remaining in the Net Settlement Fund after distribution(s) to Class Members will be distributed in a subsequent Settlement Payment to Class Members. *Id.* § 4.9.

The Settlement presents a robust relief package and valuable outcome for the Class compared to other recent data breach class action settlements on a per-capita basis:

| Case Title | No. of Class Members | Settlement Fund | Amount Per Class Member | Credit Monitoring |
|---|---|---|---|---|
| *Beyer, et al. v. Flagstar Bank* | **1.48M** | **$5.9M** | **$3.99** | **3 years** |
| *In re Target Corp. Customer Data Breach Security Litigation* | 97.5M | $10M | $0.10 | Documented Cost Reimbursement |
| *In re LinkedIn User Privacy Litig.* | 6.4M | $1.25M | $0.20 | N/A |
| *In re The Home Depot Inc. Customer Data Security Breach Litig.* | 40M | $13M | $0.33 | 18 Months |
| *In re Yahoo! Inc. Customer Data Breach Litigation* | 194M | $117.5M | $0.61 | 2 years |
| *Adlouni v. UCLA Health Systems Auxiliary, et al.* | 4.5M | $2M | $0.44 | 2 years |
| *Atkinson, et al. v. Minted, Inc.* | 4.1M | $5M | $1.22 | 2 years |
| *In re Experian Data Breach Litigation* | 16M | $22M | $1.37 | 2 years |
| *In re Anthem, Inc. Data Breach Litigation* | 79.2M | $115M | $1.45 | 2 years |
| *In re Equifax Inc. Data Security Breach Litigation* | > 147M | $380.5M | $2.59 | 4 years |
| *In re Premera Blue Cross Customer Data Security Breach Litigation* | 8.86M | $32M | $3.61 | 2 years |

Wolfson Decl. ¶ 30. The Settlement amount strongly supports preliminary approval on a per-capita basis alone. The Settlement amount is even stronger in light of the fact that the Settlement does not release claims against Accellion, another potential source of recovery for damages stemming from the Data Breach, as well as the additional risks of litigation based on the unique circumstances of this Data Breach, discussed above in Section B.2.

27

1   Furthermore, the substantive and meaningful injunctive relief obtained as part of this

2   Settlement further supports approval. *See e.g., Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1114

3   (9th Cir. 2020) (inclusion of "enhanced disclosures and practices changes" in settlement agreement

4   supports approval).

5   **5.   The Proposed Method of Distribution Is Highly Effective**

6   Rule 23(e)(2)(C)(ii) requires consideration of "the effectiveness of any proposed method of

7   distributing relief to the class, including the method of processing class-member claims." Fed. R.

8   Civ. P. 23(e). "Often it will be important for the court to scrutinize the method of claims processing

9   to ensure that it facilitates filing legitimate claims. A claims processing method should deter or

10   defeat unjustified claims, but the court should be alert to whether the claims process is unduly

11   demanding." *Id.*, Advisory Comm. Note to 2018 amendment.

12   To file a claim, Settlement Class Members need only complete a Claim Form (which is in

13   plain language and straightforward to complete) and submit it along with documents supporting

14   their claimed losses. SA §§ 4.2.1-4.2.3, 5.1.1, and Ex. A; Azari Decl. ¶ 20. Claim Forms may be

15   submitted electronically or in hard copy. SA § 5.1.1. All claims will be processed by Epiq, an

16   experienced and nationally recognized class action administration firm. *Id.* §§ 1.43, 5.1; Azari

17   Decl. ¶¶ 1, 10. Epiq plans to assign specific case numbers to Settlement Class Members. Azari

18   Decl. ¶ 13. The methods of distributing relief to Settlement Class Members include both digital

19   and physical check avenues. SA § 4.3; Azari Decl. ¶ 22.

20   Following consultation with the Administrator and based upon Class Counsel's previous

21   experience in and knowledge of similar cases, Class Counsel expect the claims rate in this

22   Settlement to be between 1-3%. Wolfson Decl. ¶ 25; Azari Decl. ¶ 26. The claims rates in previous

23   data breach settlement support this conclusion:

24

25

| Case Title | Approx. Class Size | No. of Claims | Claims Rate |
|---|---|---|---|
| *Gordon, et al. v. Chipotle Mexican Grill, Inc.*, No. 1:17-cv-01415 (D. Colo.), ECF 103 at 1 & ECF 124 at ¶ 13 | 10,000,000 | 6,354 | < 0.1% |

28

| | | | |
|---|---|---|---|
| *In re Target Corp. Customer Data Security Breach Litigation*, MDL No. 14-2522 (D. Minn.), ECF 615 at ¶¶ 4, 14 | 97,447,983 | 225,856 | ~0.2% |
| *In re The Home Depot Inc. Customer Data Security Breach Litigation*, No. 1:14-md-02583 (N.D. Ga.), ECF 181-1 at 25 & ECF 245-1 at ¶ 3 | 40,000,000 | 127,527 | ~0.3% |
| *Corona v. Sony Pictures Entertainment, Inc.*, No. 2:14-cv-9600 (C.D. Cal.), ECF 145-1 at 11 n.8 & ECF 164 at 2 | 435,000 | 3,127 | ~0.7% |
| *In re LinkedIn User Privacy Litig.*, No. 12-cv-03088-EJD (N.D. Cal.), ECF 122 at 2 & ECF 145-2 at ¶ 12 | 6,400,000 | 47,336 | ~0.7% |
| *In re Banner Health Data Breach Litigation*, No. 2:16-cv-2696 (D. Ariz.), ECF 170 at 1, and ECF 195-3 at ¶ 12 | 2,900,000 | 39,091 | ~1.3% |
| *In re Anthem, Inc. Data Breach Litig.*, No. 5:15-md-02617-LHK (N.D. Cal.), ECF 1007 at 4 & ECF 1007-6 at ¶ 2 | 79,200,000 | 1,380,000 | ~1.7% |
| *Adlouni v. UCLA Health Systems Auxiliary, et al.*, BC589243 (Cal. Super. Ct.) | 4,500,000 | 108,736 | ~2.4% |
| *In re Experian Data Breach Litigation*, No. 8:15-cv-01592-JLS-DFM (C.D. Cal.), ECF 286-1 at 20 & ECF 309-3 at ¶ 8 | 14,931,074 | 436,006 | ~2.9% |
| *Sheth v. Washington State University*, No. 3:17-cv-05511 (W.D. Wash.) | 992,327 | 37,712 | ~3.8% |
| *Winstead v. ComplyRight, Inc.*, No. 1:18-cv-4990 (N.D. Ill.) | 665,680 | 28,073 | ~4.2% |
| *In re Premera Blue Cross Customer Data Security Breach Litigation*, No. 3:15-md-2633 (D. Or.), ECF 273 at 12-13 & ECF 301 at ¶ 13 | 8,855,764 | 803,710 | ~9.1% |
| *In re Equifax Inc. Data Security Breach Litigation*, No. 1:17-md-2800 (N.D. Ga.), ECF 739-1 at 20 & ECF 900-4 at ¶ 5 | 147,000,000 | 15,000,000 | ~10.2% |

**6.      The Extent of Discovery Completed and the Stage of the Proceedings**

While this matter is still in its early stages, Plaintiffs have diligently developed the facts and legal claims in this case. Plaintiffs conducted significant confirmatory discovery to establish, *inter alia*, facts relevant to the breach and Flagstar's liability, Flagstar's reaction to and actions after the breach, and class size. Wolfson Decl. ¶¶ 12-15, 17-21, 28; *see* Section III.C, *supra*. Plaintiffs and their counsel have stayed abreast of all material developments involving the FTA Data Breach, including those impacting Flagstar. *Id*. ¶ 12. Counsel gathered the press releases and statements

29

concerning the FTA Data Breach, reviewed the information Flagstar has provided on its website about the breach (*see* https://www.flagstar.com/customer-support/accellion-information-center.html (last visited Sep. 2, 2021), reviewed Flagstar's data breach notification letters, reviewed the Mandiant forensics report (*see* n.4*, supra*), and reviewed numerous news stories and other publicly-available sources of information relating to the FTA Data Breach, including its impact on Flagstar. *Id.*

The Parties engaged in informal discovery to confirm the Settlement as fair, reasonable, and adequate. As part of the negotiations and Settlement, the Parties engaged in confirmatory discovery to not only verify the relevant facts, but also the fairness of the Settlement. Wolfson Decl. ¶¶ 18, 28. Proposed Class Counsel's knowledge of facts of this case and of the practice area more broadly informed Plaintiffs' clear view of the strengths and weaknesses of the case, the decision to twice go to mediation with Flagstar, and the decision to recommend that the Court grant preliminary approval to the Settlement. Wolfson Decl. ¶¶ 31-33, 53.

## 7.    The Experience and Views of Counsel

Proposed Class Counsel include attorneys who have substantial experience in complex class action litigation, including in data breach and data privacy cases. Wolfson Decl. ¶¶ 38-52 and Ex. 2. For example, Ms. Wolfson has decades of experience in privacy litigation, serves as co-lead counsel in the ongoing Zoom, Ring, and Google Location History privacy cases, and served as co-lead counsel both in the Premera and Experian data breach class actions, among numerous others. Wolfson Decl. ¶¶ 40-52. Proposed Class Counsel fully endorse the Settlement as fair, reasonable, and adequate to the Class, and do so without reservation. *Id*. ¶¶ 6, 29, 53.

## 8.    The Presence of a Governmental Participant

Although Flagstar reports communicating with law enforcement in the wake of the FTA Data Breach, no governmental agency is involved in this litigation. The Attorney General of the United States and Attorneys General of each State will be notified of the proposed Settlement pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, and will have an opportunity to raise any concerns or objections. Azari Decl. ¶¶ 21, 27.

1

### 9.   The Reaction of Class Members to the Proposed Settlement

The Class has yet to be notified of the Settlement and given an opportunity to object, so it is premature to assess this factor. Before the final approval hearing, the Court will receive and be able to review all objections or other comments received from Class Members, along with a full accounting of all opt-out requests.

### 10.   The Settlement Is the Product of Arm's-Length Negotiations that Were Free of Collusion

The Court must be satisfied that "the settlement is not the product of collusion among the negotiating parties." *In re Bluetooth Headset*, 654 F.3d at 946-47.

Plaintiffs achieved the Settlement in contested litigation and through arm's-length negotiations that involved two intensive mediation sessions before a highly respected mediator. Plaintiffs undertook substantial investigation of the underlying facts, causes of action, and potential defenses to those claims. Wolfson Decl. ¶¶ 12, 18, 28.

When settlement negotiations began, Plaintiffs and their counsel had a clear view of the strengths and weaknesses of their case and were in a strong position to make an informed decision regarding the reasonableness of a potential settlement. The Parties engaged in extensive arm's length negotiations, including two mediation sessions before a mutually agreed upon mediator, the Hon. Jay C. Gandhi (Ret.) on July 13 and July 26, 2021. *Id*. ¶¶ 31-33.

Judge Gandhi, a highly respected and experienced mediator, has extensive experience in class action litigation, both from his time as a magistrate judge in the Central District of California and as a result of mediating many class actions, including multiple data breach cases where a settlement was reached and subsequently approved.[7] His involvement here further confirms the absence of collusion. *G. F. v. Contra Costa Cnty*., No. 13-cv-03667, 2015 WL 4606078, at *13 (N.D. Cal. July 30, 2015) ("[T]he assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.") (internal quotation marks and citation omitted).

---

[7] *See, e.g., In re Premera Blue Cross Customer Data Sec. Breach Litig.*, No. 3:15-MD-2633, 2019 WL 3410382, at *1 (D. Or. July 29, 2019); *In re Banner Health Data Breach Litigation*, No. 2:16-cv-02696-PHX-SRB (D. Ariz. Dec. 5, 2019), ECF No. 170, at 6 (parties engaged in private mediation with Judge Gandhi).

1      *Bluetooth* identified three "signs" of possible collusion: (1) "when counsel receive[s] a

2 disproportionate distribution of the settlement"; (2) "when the parties negotiate a 'clear sailing

3 arrangement,'" under which the defendant agrees not to challenge a request for an agreed-upon

4 attorney's fee; and (3) when the agreement contains a "kicker" or "reverter" clause that returns

5 unawarded fees to the defendant, rather than the class. *Bluetooth, supra,* 654 F.3d at 947.

6      None of the *Bluetooth* signs are present here. There is no "free sailing provision" and Class

7 Counsel will not seek fees and expenses that exceed the 25% of the Fund benchmark set by

8 *Bluetooth*. *Id.* at 942; SA § 11.3; *see, supra,* Sec. IV.H. There is no reversion of the Settlement

9 Fund (SA § 4.11), but rather the Settlement makes every effort to distribute any Residual to the

10 Class (*see id*. §§ 4.9, 4.11). Proposed Class Counsel will apply for fees from this non-reversionary

11 Settlement Fund, so that there was every incentive to secure the largest fund possible.

12      There is no indication or existence of collusion or fraud in the settlement negotiations and

13 the Settlement that is being presented to the Court.

14           **11.    The Proposed Notice Plan is Appropriate**

15      Rule 23 requires that prior to final approval, "[t]he court must direct notice in a reasonable

16 manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). For

17 classes certified under Rule 23(b)(3), "the court must direct to class members the best notice that

18 is practicable under the circumstances, including individual notice to all members who can be

19 identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The Rule provides, "notice may

20 be by one or more of the following: United States mail, electronic means, or other appropriate

21 means." *Id*.

22      "The standard for the adequacy of a settlement notice in a class action under either the Due

23 Process Clause or the Federal Rules is measured by reasonableness." *Wal-Mart Stores, Inc. v. Visa*

24 *U.S.A., Inc.*, 396 F.3d 96, 113 (2d Cir. 2005), *cert. denied*, 544 U.S. 1044 (2005). The best

25 practicable notice is that which is "reasonably calculated, under all the circumstances, to apprise

26 interested parties of the pendency of the action and afford them an opportunity to present their

27 objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *Wershba v.*

28

*Apple Comput., Inc.*, 91 Cal. App. 4th 224, 252 (2001) ("As a general rule, class notice must strike a balance between thoroughness and the need to avoid unduly complicating the content of the notice and confusing class members.").

The notice should provide sufficient information to allow Class Members to decide whether they should accept the benefits of the settlement, opt out and pursue their own remedies, or object to its terms. *Id.* at 251-52. "[N]otice is adequate if it may be understood by the average class member." *Warner v. Toyota Motor Sales, U.S.A., Inc.*, No. CV 15-2171, 2016 WL 8578913, at *14 (C.D. Cal. Dec. 2, 2016) (quoting 4 NEWBERG ON CLASS ACTIONS § 11:53, at p. 167 (4th ed. 2013)).

The Notice Plan agreed to by the Parties and approved by the Administrator includes direct notice by emailing or mailing the Summary Notice to all Settlement Class Members, and reminder emails to those for whom email addresses are available. SA §§ 6.3-6.8; Azari Decl. ¶¶ 13-16. The Administrator will design and conduct an internet digital advertising publication notice program and Settlement Website, which will continue through the Claims Deadline. SA §§ 6.4, 6.7; Azari Decl. ¶¶ 17-18.

The Long Form Notice is clear, precise, informative, and meets all the necessary standards, allowing Class Members to make informed decisions with respect to whether they remain in or opt out of the Settlement Class, or object to the Settlement. It includes a clear description of the claims and the history of the litigation; a description of the Class; a description of the Settlement and the claims being released; the names of Class Counsel; a statement of the maximum amount of attorneys' fees that will be sought by Class Counsel; the amount Plaintiffs will seek for Service Payments; the Fairness Hearing date; a description of Class Members' opportunity to appear at the hearing; a statement of the procedures and deadlines for requesting exclusion and filing objections to the Settlement; and the manner in which to obtain further information. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 496 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998); MANUAL FOR COMPLEX LITIGATION § 30.212 (4th ed. 2004) (Rule 23(e) notice should provide a summary of the litigation and the settlement to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings). Further, the

---

33

Notice describes the plan and priority of distribution and provides for recovery estimates to best inform class members.

The proposed Notice Plan represents the best notice practicable. It was reviewed and analyzed to ensure it meets the requisite due process requirements. Azari Decl. ¶¶ 2-26. Copies of all the notice documents are attached as exhibits to the Settlement Agreement; they are clear and concise, and directly apprise Settlement Class Members of all the information they need to know to make a claim, opt out, or object. Fed. R. Civ. P. 23(c)(2)(B); *see also* Azari Decl. ¶¶ 21, 23. The Notice Plan is consistent with, and exceeds, other similar court-approved notice plans, the requirements of Fed. Civ. P. 23(c)(2)(B), the Northern District of California Procedural Guidance for Class Action Settlements (Guidance # 3), and the Federal Judicial Center ("FJC") guidelines for adequate notice.

As there is no alternative method of notice that would be practicable here or more likely to notify Class Members, the proposed Notice plan constitutes the best practicable notice to Class Members and complies with the requirements of Due Process.

### 12.    Appointment of Settlement Class Counsel

Under Rule 23, "a court that certifies a class must appoint class counsel [who must] fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). In making this determination, courts consider the following attributes: the proposed class counsel's (1) work in identifying or investigating potential claims, (2) experience in handling class actions or other complex litigation, and the types of claims asserted in the case, (3) knowledge of the applicable law, and (4) resources committed to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i-iv).

Here, proposed Settlement Class Counsel have extensive experience prosecuting complex consumer class action cases, and specifically data breach and data privacy cases. Wolfson Decl. ¶¶ 38-52 and Ex. 2. As described above and in Ms. Wolfson's supporting declaration and AW's firm resume, Proposed Class Counsel meet all Rule 23(g)(1)(A) factors.

Accordingly, the Court should appoint Ahdoot & Wolfson, PC as Class Counsel.

### 13. Settlement Deadlines and Schedule for Final Approval

In connection with preliminary approval, the Court must set a final approval hearing date, dates for mailing the Notices, and deadlines for objecting to the Settlement and filing papers in support of the Settlement. Plaintiffs propose the following schedule, which the parties believe will provide ample opportunity for Class Members to decide whether to request exclusion or object:

| EVENT | DATE |
|---|---|
| Notice Date (U.S. Mail and email) | Within 30 Days from the Preliminary Approval Order |
| Deadline to Submit Claim Forms | 90 Days from the Notice Date |
| Deadline to Submit Motion for Attorneys' Fees, Costs and Service Payments | At Least 35 Days Before the Objection Deadline |
| Deadline to Object and Comment to the Settlement | 75 Days from the Notice Date |
| Deadline to Submit Request for Exclusion | 75 Days from the Notice Date |
| Final Fairness Hearing | To be Determined |

## VI. CONCLUSION

Plaintiffs Grace Beyer, Christopher Hauser, Charles Tyer, and Stefanie Burton respectfully request that this motion be granted and that the Court enter an order: (1) certifying the proposed class for settlement; (2) preliminarily approving the proposed class action Settlement; (3) appointing Plaintiffs as Class Representatives and Ahdoot & Wolfson, PC as Class Counsel; (4) appointing Epiq as the Settlement Administrator; (5) approving the proposed Class Notice Plan and related Settlement administration documents; and (6) approving the proposed class settlement administrative deadlines and procedures, including setting a final fairness hearing date, and approving the proposed procedures regarding objections, exclusions and submitting Claim Forms.

Dated: September 3, 2021                 Respectfully submitted,

                                         /s/ Tina Wolfson
                                         TINA WOLFSON (SBN 174806)

35

twolfson@ahdootwolfson.com
ROBERT AHDOOT (SBN 172098)
rahdoot@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Tel:  310.474.9111; Fax: 310.474.8585

ANDREW W. FERICH (*pro hac vice* pending)
aferich@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Tel:  310.474.9111; Fax: 310.474.8585

*Attorneys for Plaintiffs and the Proposed Class*

MEMORANDUM OF POINTS AND AUTHORITIES ISO PRELIMINARY APPROVAL
No. 5:21-cv-02239-EJD